## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JOHNS HOPKINS UNIVERSITY**
3400 North Charles Street
Baltimore, Maryland 21218;

Plaintiff,

v.

**U.S. DEPARTMENT OF HOMELAND SECURITY**
245 Murray Lane, SW
Washington, DC;

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
500 12th Street, SW
Washington, D.C. 20536;

**CHAD WOLF**, in his official capacity as Acting Secretary of the U.S. Department of Homeland Security
245 Murray Lane, SW
Washington, DC; and

**MATTHEW ALBENCE**, in his official capacity as Acting Director of the U.S. Immigration and Customs Enforcement
500 12th Street, SW
Washington, D.C. 20536;

Defendants.

Case No. 20-cv-1873

COMPLAINT FOR DECLARATORY RELIEF AND TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

## INTRODUCTION[1]

1.      Long before the highly infectious, sometimes lethal, virus known as COVID-19 became a global pandemic, researchers at Johns Hopkins University ("Johns Hopkins") began tracking the first illnesses appearing in Wuhan, China in January 2020.  Since then, the university's

---

[1]  Consistent with the exigencies it confronts, Johns Hopkins will be filing a corresponding request for a temporary restraining order and preliminary injunction at the first opportunity, expected to be this Monday morning, July 13, 2020.  Undersigned counsel is specifically engaging with the

Coronavirus Resource Center has become perhaps the most comprehensive and up-to-date database in the world, aggregating data from all 3,141 counties in the United States and more than 188 countries worldwide.  Attracting more than 700 million views from Seattle to Sydney to Mumbai, Johns Hopkins' data and public health expertise has been relied upon by numerous entities, including Defendant the Department of Homeland Security, the President's Coronavirus Task Force, the Centers for Disease Control and Prevention, the United Nations, the domestic and international media, and everyday citizens seeking to keep abreast of the virus' trendlines.

2.      On the eve of university re-openings, however, Defendants have issued a new directive that would send international students back to their countries if they are unable (or unwilling) to have in-person classes during an ongoing pandemic.  This action undercuts the country's longstanding commitment to harnessing the ideas, energies, and contributions of citizens from around the world.  Only by virtue of their ability to attract the world's most talented and ambitious people, including international students who may one day become immigrants to this country, do research universities like Johns Hopkins play their integral role in enhancing the country's dynamism, competitiveness, and global influence.  By visiting arbitrary and capricious consequences on foreign students, the challenged action contravenes our country's most vaunted values and interests.

3.      The statistics on the pandemic Johns Hopkins has published have been sobering:  over 12.2 million people infected worldwide and more than half a million deaths attributable to COVID-19.  In recent days, according to the Johns Hopkins database, the United States has crossed the grim milestone of 3 million infections and over 133,000 deaths.

4.      Amid rising infections and death toll, President Donald J. Trump declared a national emergency on March 13, 2020.[2]  By that time, Governor Larry Hogan had already announced a state

---

Department of Justice to ensure that Defendants are duly apprised and equipped to respond.

[2]  President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020),

of emergency in Maryland, where Johns Hopkins is based, and Mayor Muriel Bowser followed soon

thereafter, declaring a public health emergency for the District of Columbia, which houses the

prestigious Paul H. Nitze School of Advanced International Studies and other Johns Hopkins

programs.[3]  Numerous states and municipalities, including Maryland and the District of Columbia,

issued stay-at-home restrictions to try to contain the spread of the virus, forcing businesses,

restaurants, universities, K-12 schools, religious institutions, and other establishments to temporarily

close.  The resulting financial toll arising from the shutdowns has been devastating, causing the worst

economic crisis since the Great Depression.

5.      Like many of its peer institutions, Johns Hopkins acted swiftly to protect its students,

faculty and staff from the COVID-19 virus by transitioning on March 10, 2020 to a virtual learning

environment in which students could continue their education from the safety of their homes.  This

transition was, of course, attended by enormous efforts by and significant financial consequences for

Johns Hopkins, which went to great lengths to ensure that those students most at risk and hardest hit

by the pandemic had access to emergency funds so they could return home, obtain the necessary

hardware and access to an online educational platform, or both.

6.      The federal government, too, previously took conscientious measures to preserve the

safety and continued education of international students studying at American universities who could

no longer attend in-person classes and study and live on university campuses.  On March 13, 2020,

federal acknowledgement of the epidemic manifested itself in an "exemption" issued by United States

Immigration and Customs Enforcement ("ICE"), a division of the Department of Homeland Security,

---

https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

[3]   Office of the Mayor, *Mayor Bowser Declares Public Health Emergency* (Mar. 11, 2020), https://mayor.dc.gov/release/mayor-bowser-declares-public-health-emergency; The Office of Governor Larry Hogan, *Governor Larry Hogan Declares State of Emergency, Expands Statewide Response to Novel Coronavirus* (Mar. 5, 2020), https://governor.maryland.gov/2020/03/05/governor-larry-hogan-declares-state-of-emergency-expands-statewide-response-to-novel-coronavirus/.

to a preexisting rule that students in the country on certain nonimmigrant student visas ("F-1" visas) must attend most classes in person (the "March 13 Guidance").  Recognizing the breadth and depth of the emergency and the needs of students, educational institutions, and the nation, ICE provided that students holding nonimmigrant visas could attend classes remotely while retaining their visa status. The government made clear that this arrangement was "*in effect for the duration of the emergency*."[4]

7.      As a result of, and in reliance on, this significant change in policy, hundreds of international students hailing from over 120 countries enrolled in the nine different schools at Johns Hopkins flew home and continued to receive remotely the high-quality education for which Johns Hopkins is renowned.  Significantly, all of these students were able to continue to maintain their F-1 visa status while partaking of a completely virtual curriculum.  In addition, 147 students who could not return home, including many international students, were approved to remain in the Baltimore or Washington areas.  Some of these students were permitted to continue residing on campus even as classes moved to an online format.

8.      Since this spring, Johns Hopkins has been relying on real-time data from its Coronavirus Resource Center, the input of its Health Advisory Group comprised of Johns Hopkins faculty, feedback from faculty, staff, and students, and the pedagogical goals of its academic programs to plan for the fall 2020 semester.  In the course of time-intensive and detailed planning discussions, the nine undergraduate and graduate schools of Johns Hopkins[5] carefully developed re-opening plans that they submitted for approval to the university's senior leadership.  Depending on the pedagogical missions and research needs of the individual schools, and the composition and other needs of its

---

[4]   U.S. Immigration and Customs Enforcement, *COVID-19: Guidance for SEVP Stakeholders* (Mar. 13, 2020),
https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf.

[5]   These schools are: the Bloomberg School of Public Health; the School of Advanced International Studies; the Carey Business School; the Krieger School of Arts and Sciences; the School of Education; the Whiting School of Engineering; the School of Medicine; the School of Nursing; and

student bodies, the re-opening plans ranged from a fully virtual curriculum (as was being considered for the School of Public Health) to a hybrid combination of in-person and remote education (as in the undergraduate programs at the Krieger School of Arts & Sciences, the Whiting School of Engineering, and the Peabody Institute).[6]  Notably, none of the schools proposed a fully in-person learning environment given what Johns Hopkins educators, researchers, and scientists knew better than almost anyone:  data demonstrating a significant uptick in the number of infections nationwide caused by COVID-19 in the wake of relaxation of federal and state stay-at-home mandates.

9.      This flexibility and discretion to determine the safest educational environment for its community has been and remains paramount to Johns Hopkins, particularly in light of the prominent role its schools, such as the Bloomberg School of Public Health, have been playing throughout the pandemic.  This expertise led Johns Hopkins not only to mitigate the risk of spread inherent in large gatherings by enacting numerous safety protocols, including securement of hotel rooms that disperse student housing, but also to design a school calendar that would end most undergraduate students' on-campus presence before Thanksgiving.  Classes after Thanksgiving would resume online for the duration of the term.  This approach would allow students to go home to their families for the Thanksgiving holiday, while eliminating the burden of an additional return flight, as well as the risk that students might come back to campus carrying the virus and become a "super-spreader" in a community that houses vulnerable faculty, staff, and other students.  If such plans are now potentially to be changed, Johns Hopkins should be left free of interference and permitted to apply its discretion and expertise in deciding whether and how to change them.

10.      Unfortunately, the university's careful planning has just been completely upended by the actions of Defendants.  Immediately after the Independence Day weekend, after President Trump

---

the Peabody Institute.

[6]  Coronavirus Information, *Information for Undergraduate Students*, Johns Hopkins University, https://covidinfo.jhu.edu/information-for-undergraduate-students/ (last visited July 10, 2020).

declared that the virus would "fade away"[7] and "just disappear"[8] and tweeted that "SCHOOLS MUST

RE-OPEN,"[9] the Department of Homeland Security and ICE suddenly and unexpectedly plunged

Johns Hopkins—and virtually all of higher education in the United States—into chaos.   Specifically,

the agency announced on July 6, 2020 (the "July 6 Directive"), without notice or customary (and

required) comment period, that it was rescinding its COVID-19 rule for international students.

Instead of permitting international students—many of whom remain restricted to their home countries

under international travel bans—to continue their education through remote learning under the March

13 Guidance, the July 6 Directive declared that all students on F-1 visas whose university curriculum

was entirely online would be required to depart the country or risk facing deportation.   In addition,

students currently outside the United States, who are weeks from returning to Johns Hopkins

campuses, would be barred from entering the United States.   ICE also purported to require colleges

and universities whose classes would be entirely online to submit an "operational change plan" no

later than Wednesday, July 15, 2020—*nine days after the change was announced*.

        11.      The July 6 Directive did not stop there.   It also announced that universities like Johns

Hopkins that are contemplating a hybrid model—a mixture of online and in-person classes—would

have to certify for each student on an F-1 visa that the "program is not entirely online, that the student

is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the

minimum number of online classes required to make normal progress in their degree program."   The

Directive did not provide clarity as to what level of in-person education was required, saying only that

---

[7]   John Wingrove, *President Trump Claims Coronavirus Will 'Fade Away' – as U.S. Sees 20,000 New Cases a Day*, Time (June 18, 2020), https://time.com/5855541/trump-coronavirus-fade-away/.

[8]   JM Rieger, *19 times Trump said the coronavirus would go away*, Wash. Post (July 2, 2020), https://www.washingtonpost.com/video/politics/19-times-trump-said-the-coronavirus-would-go-away/2020/04/30/d2593312-9593-4ec2-aff7-72c1438fca0e_video.html.

[9]   Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM), https://twitter.com/realDonaldTrump/status/1280209946085339136.

students should receive some in-person education such that their programs are "not entirely online."[10] Universities on a hybrid model would be required to issue a new Form I-20 for each of these students—in the case of Johns Hopkins, numbering in the thousands—by August 4, 2020.

12.    ICE's rash action was unaccompanied by any indication that it considered the health of university students, faculty, staff, or surrounding communities.  It proceeded without any consideration of the reliance of both students and universities on ICE's statements that the preexisting exemptions would be "in effect for the duration of the emergency" posed by the COVID-19 pandemic, which demonstrably continues at alarming levels to this day.  It proceeded while ignoring the complete inability of students in certain countries to have access to other educational options or the difficulty of gaining last-minute admissions or transfers.  It proceeded without the required notice-and-comment period.  And it proceeded without repealing or grappling with the President's declaration of a national emergency on which the March 13 Guidance was based.

13.    The upshot now leaves hundreds of thousands of international students with no secure educational pathways within the United States.  Just weeks before the fall semester starts, these students are largely unable to transfer to universities providing on-campus instruction, notwithstanding ICE's suggestion that they might do so to avoid removal from the country.  Moreover, for many students, returning to their home countries to participate in online instruction is impossible, prohibitively expensive, technologically infeasible, dangerous, or some combination of the foregoing.

14.    ICE's action also leaves universities across the country, including the various schools within Johns Hopkins, in the untenable dilemma of either moving forward with their carefully calibrated, thoughtful decisions to proceed with their curricula fully or partially online in the fall of

---

[10]    Student and Exchange Visitor Program, U.S. Immigration and Customs Enforcement, *Broadcast Message: COVID-19 and Fall 2020* (July 6, 2020), https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf.

2020, or to attempt, just weeks before classes resume, to provide in-person education in every one of
its schools, while still needing to navigate the public health and safety considerations implicated by
any such change.  Ultimately, the July 6 Directive leaves Johns Hopkins and its students facing
unavoidable but debilitating risk that the most fervent efforts to provide in-person education may be
foiled midstream by circumstances altogether beyond their control.

15.     Notably, even if it bowed to the Trump Administration's transparent pressure to offer
fully in-person education, Johns Hopkins and its students would still face the risk that the uptick in
COVID-19 infections could result in new stay-at-home mandates that would require Johns Hopkins to
return to fully virtual education once again in the midst of the academic term.  Under the July 6
Directive, such a shift would cause the thousands of international students at Johns Hopkins—and
millions nationwide—to be at risk of losing their F-1 visa status and require them to depart the United
States within a matter of days, or be immediately deported simply because they are unable to obtain
15 weeks of in-person education, as required by the Directive.[11]

16.     In effect, ICE has forced on Johns Hopkins and universities throughout the nation the
Hobson's choice between compromising, on the one hand, its academic mission and unique
contributions to the global fight against COVID-19, or, on the other hand, protecting the health and
safety of its students, faculty, and staff according to its own best judgment, as informed by its up-to-
the-minute, world-leading expertise and data.

17.     By all appearances, ICE's decision reflects an effort by the federal government,
consistent with President Trump's public statements, to force universities to re-open in-person classes,
irrespective of educators' and experts' assessments of the public health risks and the implications for
international students both currently in the United States and abroad, some of whom under travel bans
or consular closures have no ability to study in-person even if fervently committed to doing so.  The

_____

[11]  *Id.*

8

effect is to put international students in an untenable position and to coerce universities into re-opening without regard for the status of the global pandemic.

18.     In suddenly overturning the careful planning Johns Hopkins and other universities underwent for the 2020–2021 academic year in reliance on ICE's recognition that the COVID-19 pandemic compelled allowing international students to maintain their visa status even if their studies had been moved entirely online, ICE failed to consider numerous weighty interests.  First, the July 6 Directive is itself arbitrary and capricious and an abuse of discretion under the Administrative Procedure Act ("APA").  Further, ICE's action, in failing to provide notice or opportunity to comment, is procedurally defective under the APA and works a deprivation of Due Process for both students and universities.  Moreover, the regulatory language is unconstitutionally vague, placing both universities and students trying to interpret the new requirements at risk of sanction for failing to comply with the Directive.  Finally, among the interests that ICE ignored is the educational autonomy of universities, as constitutionally recognized, to fashion their educational programs in ways that best advance their pedagogical missions and protect the health and safety of students under their care.

19.     The July 6 Directive should be set aside, and the government required to abide by the guidance issued on March 13, 2020—guidance on which universities and students predictably relied in planning a fall semester during an ongoing global pandemic.  Because the Directive does not undo the presidential declaration of a national emergency, nor could it, there was no rational basis to undo the March 13 Guidance, which promised to remain "in effect for the duration of the emergency."

20.     Lastly, a temporary restraining order and permanent injunctive relief are warranted to provide emergency and interim relief in light of the pending July 15, 2020 certification date Defendants purport to impose, Johns Hopkins' imminent re-opening dates by which students, faculty, and staff must finalize their plans, and the irreparable injury Johns Hopkins and its students will suffer unless the July 6 Directive is suspended during the pendency of this action.

9

21.     Johns Hopkins' international students constitute a critical component of its academic mission.  Rendering participation of much of its international student body impossible or insignificant will impair the educational experience for all Johns Hopkins students, faculty, and staff; deprive the university of innovative research contributions, including in the fields of public health and medicine during the age of a global pandemic; stunt the development of scholarship; and do grave harm to Johns Hopkins' mission of bringing the benefits of discovery to the world.

## THE PARTIES

22.     Plaintiff Johns Hopkins University is a non-profit, private research university located across several campuses in Maryland, Washington, D.C., and elsewhere.  It provides graduate and undergraduate instruction to approximately 27,000 students annually, including approximately 5,000 students who study in the United States on F-1 visas.  Johns Hopkins brings this lawsuit on behalf of itself and its students holding F-1 visas.

23.     Defendant United States Department of Homeland Security is a federal agency of the United States.

24.     Defendant United States Immigration and Customs Enforcement is a division of the United States Department of Homeland Security.

25.     Defendant Chad F. Wolf is the Acting Secretary of the United States Department of Homeland Security.  He is sued in his official capacity.

26.     Defendant Matthew Albence is the Acting Director of United States Immigration and Customs Enforcement.  He is sued in his official capacity.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. Johns Hopkins is an entity aggrieved by a final agency action promulgated by Defendants.  *See* 5 U.S.C. § 702.  Johns Hopkins brings this suit for declaratory and injunctive relief to set aside

Defendants' action as contrary to law and arbitrary and capricious, *see id.* §§ 705, 706, presenting a federal question, *see* 28 U.S.C. § 1331.

28.  Sovereign immunity is waived under 5 U.S.C. § 702.

29.  Venue in this Court is proper under 28 U.S.C. § 1391(e).  Defendants are agencies of the United States and officers of those agencies acting in their official capacity; they reside in this District; and they promulgated the unlawful July 6 Directive from this District.

30.  Johns Hopkins has standing to bring this case.  Defendants' actions will cause an imminent, concrete, and irreparable risk to Johns Hopkins University's ability to achieve its educational mission unless halted by this Court.

31.  Johns Hopkins also has standing to assert claims on behalf of its students holding F-1 visas because Defendants' actions have encroached on the university's constitutionally protected academic freedom and discretion to control its own curricula and student body.  Furthermore, Defendants' actions expose Johns Hopkins' students to imminent, concrete, and irreparable risk of harm to themselves, their families, their educations, their short-term and long-term health, and their future education and employment prospects if Defendants' actions are not enjoined by this Court. Protecting its students is at the core of Johns Hopkins' mission and responsibilities, and injury to its students' education and well-being on campus correspondingly injures Johns Hopkins.

32.  This Court is authorized to grant the requested injunctive relief pursuant to Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705.

## FACTS
### Johns Hopkins' Rights and Responsibilities to its Community

33.  Founded in 1876, Johns Hopkins is one of the nation's premier academic and research institutions.  It has approximately 27,000 students across nine divisions on campuses in Maryland, Washington, D.C., and elsewhere.  The university's two undergraduate schools, the Krieger School of Arts and Sciences and the Whiting School of Engineering, are located on the Homewood campus in

Baltimore.  The medical school, nursing school, and Bloomberg School of Public Health are located in East Baltimore.  The university is also comprised of the Peabody Institute, Paul H. Nitze School of Advanced International Studies ("SAIS"), School of Education, Carey Business School, and various other facilities.

34.     Two hallmarks of Johns Hopkins are its focus on international studies through its world-renowned SAIS school and its unparalleled expertise in public health through its Bloomberg School of Public Health, which has played a leading role in informing the global community about the nature and spread of COVID-19.

35.     As is customary for educational institutions constitutionally endowed with the discretion to determine both the delivery and content of its educational program, Johns Hopkins has made, and continues to make, swift, reasoned, and data-informed judgments about how best to protect the health and safety of its community during the COVID-19 pandemic, while enabling students to continue their academic pursuits.  These decisions have been informed by both the university's pedagogical mission, including to foster a rich and culturally sensitive international environment, as well as the comprehensive, real-time data Johns Hopkins and its Coronavirus Resource Center have assembled and studied.

## The COVID-19 Pandemic

36.     As Johns Hopkins' public health experts know all too well, SARS-CoV-2, which causes the COVID-19 illness, is easily transmitted through human contact.  The numbers of confirmed cases and deaths from COVID-19 have grown exponentially in the United States since January 2020 and are expected to continue to grow exponentially over the coming months.  Indeed, according to Johns Hopkins University's own Coronavirus Resource Center, millions have contracted the disease in the United States alone.[12]

---

[12]   Coronavirus Resource Center, Johns Hopkins University & Medicine, https://coronavirus.jhu.edu/map.html (last visited July 10, 2020).

37.     All human beings share a risk of contracting and, upon contraction, transmitting the virus that causes COVID-19.  Any adult who contracts the virus may experience life-threatening symptoms, lifelong health consequences, and death.

38.     New information regarding this virus is released daily by public health authorities. People who experience serious cases of COVID-19 and do not pass away face the prospect of protracted, difficult recovery, frequently entailing the need for extensive rehabilitation for profound reconditioning, loss of digits, permanent neurologic damage, and the irreversible loss of respiratory capacity.

39.     People can also carry and spread the novel coronavirus but be asymptomatic or pre-symptomatic.  As a result, testing or seclusion of only those who are symptomatic is an inadequate solution.

40.     There is no vaccine against COVID-19, nor is there any known medication to prevent infection.  The most effective ways to reduce the risk are to prevent vulnerable populations from being infected in the first place and to limit community spread.  Physical distancing, or remaining physically separated from known or potentially infected individuals, and vigilant sanitation and hygiene are the most effective measures for protecting people from contracting the novel coronavirus.

41.     Evidence from Johns Hopkins and other public health experts indicates that COVID-19 is likeliest to be transmitted through close human-to-human contact, especially indoors.  This presents a particular risk for university campuses.  Crowded classrooms, dining facilities, and dormitories are commonplace features of ordinary campus life and could lead to large-scale outbreaks of COVID-19 until the pandemic subsides.

42.     Nationally, projections by the United States Centers for Disease Control and Prevention ("CDC") indicate that more than 200 million people in the United States could be infected

with the novel coronavirus over the course of the pandemic, and the most severe projections raise the specter of as many as 1.7 million deaths.[13]

43.     Efforts to contain the spread of this highly contagious disease have included broad shutdowns of society.  On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidance advising individuals to adopt far-reaching physical distancing measures, such as working from home; avoiding discretionary travel, shopping trips, and gatherings of more than 10 people; and staying away from bars, restaurants, and food courts.[14]

44.     Following this advice, many states including Maryland, as well as the District of Columbia, recognized the need to take dramatic steps to protect the health and safety of their residents from human-to-human and surface-to-human spread of COVID-19.  They accordingly issued orders suspending or severely curtailing operations of non-essential businesses, schools, and other locations where individuals congregate.  On March 13, 2020, President Donald J. Trump declared a national emergency in response to the COVID-19 pandemic.[15]

45.     Notwithstanding these mitigation measures, COVID-19 cases continue to rise nationwide.  The current guidance reflects a general policy of continued caution, and a particular concern with indoor gatherings.[16]  Notably, states that have relaxed physical distancing measures, including by allowing indoor gatherings and the opening of locations where individuals congregate— such as Texas, Arizona, California, and Florida—provide a cautionary tale.  Such states are now

---

[13]   Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, The New York Times (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html.

[14]   The President's Coronavirus Guidelines for America, coronavirus.gov, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited July 10, 2020).

[15]   President Trump, *Proclamation on Declaring a National Emergency*, *supra* note 2.

[16]   *See generall*y DC Health, Government of the District of Columbia, https://coronavirus.dc.gov/ ("Individuals must continue to practice social distancing from persons not in their household.") (last visited July 9, 2020).

seeing renewed surges and record-setting numbers of COVID-19 cases, hospitalizations, and reduced

but ongoing deaths, including among younger victims.[17]

46.     To date, there have been more than 3 million confirmed cases of COVID-19 in the

United States, resulting in more than 133,000 deaths.[18]  Both of these numbers continue to increase at

disturbing rates on a daily basis, and the declaration of national emergency remains in full force and

effect.

<strong>ICE's Initial Response to the Pandemic</strong>

47.     International students may attend American universities on nonimmigrant F-1 visas.

Eligibility to maintain F-1 status is governed by 8 C.F.R. § 214.2.

48.     Students on F-1 visas must pursue a "full course of study" during their stay in the

United States.  8 C.F.R. § 214.2(f)(5)(i).

49.     The regulation defines the extent to which online courses may count toward the full

course of study requirement.  8 C.F.R. § 214.2(f)(6)(i)(G) provides:

> For F-1 students enrolled in classes for credit or classroom hours, no
> more than the equivalent of one class or three credits per session, term,
> semester, trimester, or quarter may be counted toward the full course of
> study requirement if the class is taken on-line or through distance
> education and does not require the student's physical attendance for
> classes, examination or other purposes integral to completion of the
> class. An on-line or distance education course is a course that is offered
> principally through the use of television, audio, or computer
> transmission including open broadcast, closed circuit, cable, microwave,
> or satellite, audio conferencing, or computer conferencing. If the F-1
> student's course of study is in a language study program, no on-line or
> distance education classes may be considered to count toward a
> student's full course of study requirement.

50.     On March 13, 2020, the Student and Exchange Visitor Program ("SEVP"), a division

of ICE, issued guidance concerning F-1 students' ability to maintain their visa status (the "March 13

---

[17]   *See, e.g.*, Cecilia Smith-Schoenwalder, *Deaths Starting to Increase in States With Coronavirus Resurgences*, U.S. News (July 9, 2020), https://www.usnews.com/news/health-news/articles/2020-07-09/coronavirus-deaths-increasing-in-states-with-resurgences.

[18]   *See* Coronavirus Resource Center, *supra* note 12.

Guidance").  In its March 13 Guidance, ICE recognized the extraordinary circumstances posed by the COVID-19 pandemic and responded to "inquiries concerning the proper status" of international students in the United States on academic visas "who may have [to] face slightly different scenarios related to emergency procedures implemented by SEVP-certified learning institutions."[19]

51.     As relevant here, the March 13 Guidance addressed students attending a school that "temporarily stops in-person classes but implements online or alternate learning procedures."  The Guidance directed students to "participate in online or other alternate learning procedures and remain in active status" with SEVP.  Accordingly, students could participate in remote learning implemented as a result of the pandemic—either in the United States or abroad—while retaining their visa status.

52.     The March 13 Guidance indicated that it was a "temporary provision" that would remain "***in effect for the duration of the emergency***."  (Emphasis added.)  SEVP also noted that the situation was "***fluid***" and "***difficult***" and that "SEVP will continue to monitor the COVID-19 situation and will adjust its guidance ***as needed***."  (Emphases added.)

53.     The President's national emergency declaration has not been rescinded or terminated. An emergency in fact continues to persist, as daily COVID-19 cases in the United States have never significantly decreased and have recently begun spiking in several regions.  In fact, cases today are higher than when the emergency declaration was issued.

54.     Notwithstanding the promise in the March 13 Guidance that it would remain "in effect for the duration of the emergency," on June 4, 2020 SEVP issued a "Frequently Asked Questions" document asserting that "SEVP has not issued guidance to international students and schools for the fall semester."[20]

---

[19]   U.S. Immigration and Customs Enforcement, *COVID-19: Guidance for SEVP Stakeholders*, *supra* note 4.

[20]   U.S. Immigration and Customs Enforcement, Fre*quently Asked Questions for SEVP Stakeholders about COVID-19* (last updated June 4, 2020), https://web.archive.org/web/20200605003435/https://www.ice.gov/doclib/coronavirus/covid19faq.pdf.

**In Reliance on the March 13 Guidance, Johns Hopkins Undertook Months of Planning to Determine How Best to Fulfill Its Academic Mission While Protecting Its Community**

55.     Johns Hopkins transitioned to online instruction on March 10, 2020 in order to protect the health and well-being of its community, while enabling students to continue their academic pursuits.  Over the spring and summer, in reliance on the March 13 Guidance, Johns Hopkins engaged in careful, deliberative planning processes that prioritized the health and safety of students, faculty, and staff, as well as the university's institutional goals of delivering educational services and a meaningful experience to students.  Johns Hopkins factored into its assessment the SEVP's representation in the March 13 Guidance that, because of the pandemic, students with F-1 visas would not be required to attend in-person classes in order to retain their visa status, and that the exemption for F-1 students would continue during the pandemic.

56.     Since March 2020, Johns Hopkins has engaged dozens of formal and informal committees and groups to inform its response to the pandemic, including a Health Advisory Group comprised of expert Johns Hopkins faculty charged with advising the university's senior leadership on COVID-19 issues and ways to continue safely carrying out Johns Hopkins' academic mission. Indeed, members of the Johns Hopkins Advisory Group are themselves members of the Maryland Governor's Advisory Committee, and others advise other local, state, and federal officials.  Senior university administrators have also been conferring on weekly, and at times daily, Incident Command Calls to ensure that the various schools within Johns Hopkins are able to continue providing their high-quality education in a remote environment and in compliance with public health guidance.

57.     On May 5, 2020, the university launched a planning task force, which included six primary work groups—the Research Work Group, Academic Programs Work Group, Student Life Work Group, Health & Safety Work Group, Cross-Cutting Work Groups, and Advisory Groups — composed of 23 separate interdisciplinary teams from across the university, including faculty, staff,

and students.[21]  Over the next eight weeks, each work group evaluated and documented options for a return to campus and provided the university's deans with broad outlines of how campus operations might be conducted safely so that each school, department, and program could in turn develop detailed plans based on its individual needs and circumstances.  As of July 9, 2020, the university had sent 47 unique messages to the Johns Hopkins community, and the work groups had published for public review and comment four draft reports and two final reports.  The decisions reached in those reports were also informed by hundreds of Zoom calls, dozens of presentations, multiple student surveys, 788 unique feedback comments, and the discussions from seven town halls (with an eighth scheduled for today).

58.     In addition to these formal structures, Johns Hopkins has consulted on an ongoing basis with epidemiologists, medical experts, industry experts, and others on a wide range of topics relevant to returning students to campus and protecting their safety during instruction.

59.     Furthermore, Johns Hopkins has now become the leading source of data regarding the unprecedented COVID-19 pandemic, aggregating data from more than 188 countries or regions to track and model this fast-moving disease.  Johns Hopkins' experts in global public health, infectious disease, and emergency preparedness have been at the forefront of the international response to COVID-19.  Indeed, the Johns Hopkins University Coronavirus Center has been extensively cited as the basis for government decisions and key reporting, including by the CDC, the White House, the United Nations, various state and local governments, and major journalistic publications.[22]

---

[21]  *JHU 2020 Planning: Workgroups*, Johns Hopkins University, https://covidinfo.jhu.edu/jhu-2020-planning/workgroups/ (last visited July 10, 2020).

[22]  *See, e.g.*, Centers for Disease Control and Prevention, *COVID-19 Secondary Data and Statistics*, https://www.cdc.gov/library/researchguides/2019novelcoronavirus/datastatistics.html (last visited July 9, 2020) (listing the Johns Hopkins' online dashboard of reported cases in a list of "quality public health literature and resources"); Remarks by Vice President Pence in a Fox News Virtual Town Hall, Washington, D.C. (March 24, 2020), available at https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-fox-news-virtual-town-hall/ (Vice President Pence noting that the White House Coronavirus Task Force studies coronavirus data and numbers from various

**Johns Hopkins' Re-Opening Plan Carefully Balanced the Academic Needs of Its Community with Concerns for Public Safety Amid an Ongoing Pandemic**

60.      Based on months of study and consultation, Johns Hopkins' Bloomberg School of

Public Health was contemplating that there would not be any face-to-face instruction for the first and

second terms of the 2020–21 academic year.  On June 30, 2020, Johns Hopkins also announced that,

countries through resources such as the Johns Hopkins Global Map); Ken Cuccinelli (@HomelandKen) Twitter (Feb. 24, 2020), https://twitter.com/homelandken/status/1232026318801338368?lang=en ("Has the Johns Hopkins map of the coronavirus stopped working for other people, or just me? https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9 ecf6"); National Institutes of Health, *Coronavirus news, funding and resources for global health researchers*, https://www.fic.nih.gov/ResearchTopics/Pages/infectiousdiseases-coronavirus-cov.aspx (last visited July 9, 2020) (listing the Johns Hopkins COVID-19 interactive map on its list of coronavirus resources); Office of Mayor Muriel Bowser, Government of the District of Columbia, "COVID-19 Leave Restoration," https://edpm.dc.gov/issuances/covid-19-leave-restoration/ (last visited July 9, 2020) (listing the Johns Hopkins COVID-19 Dashboard as a reference considered in evaluating and issuing this variance); Department of Labor and Industry, Commonwealth of Virginia, "Emergency Temporary Standard/ Emergency Regulation, Infectious Disease Prevention, SARS-CoV-2 Virus That Causes COVID-19, §16 VAC 25-220," https://www.doli.virginia.gov/wp-content/uploads/2020/06/BP-Emergency-Regulation-Under-2.2-4011-SARS-CoV-2-That-Causes-COVID-19-FINAL-6.23.2020.pdf (June 24, 2020) (citing Johns Hopkins data throughout the briefing package to report on Virginia and nationwide cases of COVID-19); Kyle Swenson, *Millions track the pandemic on Johns Hopkins's dashboard. Those who built it say some miss the real story.*, Wash. Post, https://www.washingtonpost.com/local/johns-hopkins-tracker/2020/06/29/daea7eea-a03f-11ea-9590-1858a893bd59_story.html ("Since launching in January, the university's Coronavirus Resource Center has exploded in scope and popularity, garnering millions of page views and popping up in news coverage and daily conversation."); K.K. Rebecca Lai, *Are Countries Flattening the Curve for the Coronavirus?*, N.Y. Times (Apr. 3, 2020), https://www.nytimes.com/interactive/2020/04/03/world/coronavirus-flatten-the-curve-countries.html (citing data collected by the Johns Hopkins University); Talal Ansari and Catherine Lucey, *U.S. Hits 3 Million Confirmed Coronavirus Cases*, Wall St. J., https://www.wsj.com/articles/new-coronavirus-cases-hit-daily-record-in-u-s-with-60-000-11594198110  (relying on data from Johns Hopkins University's coronavirus data center to report on daily record of new cases); Colleen Shalby and Luke Money, *A third day of coronavirus surges in L.A. County brings alarm*, L.A. Times, https://www.latimes.com/california/story/2020-07-01/a-third-day-of-huge-coronavirus-surges-in-la-county-brings-alarm (citing the Johns Hopkins COVID-19 Dashboard to report on new cases); Joseph Guzman, *Here are some of the best maps to track the coronavirus pandemic*, The Hill, https://thehill.com/changing-america/well-being/prevention-cures/487469-here-are-some-of-the-best-maps-to-track-the ("A Johns Hopkins University interactive map is being used widely to track the pandemic."); United Nations Economic Commission for Africa, https://www.uneca.org/covid-19/pages/dashboard (using Johns Hopkins tracking dashboard); UNStats COVID-19 response, https://covid-19-data.unstatshub.org/datasets/bbb2e4f589ba40d692fab712ae37b9ac_2?geometry=61.931%2C-37.779%2C10.955%2C63.199 (relying on Johns Hopkins data).

with respect to its undergraduate students in the Krieger School of Arts and Sciences, the Whiting School of Engineering, the Peabody Institute, it would recommence some in-person classes at reduced capacity in the fall semester with appropriate public health measures in place, and that to the fullest extent possible, courses would be developed with mixed modality, giving students the option of participating in-person or virtually.  Thus, while undergraduate programs would be offered in a hybrid modality, many graduate programs would vary in the provision of online and in-person instruction.

61.     Consistent with its status as a leader in public health, Johns Hopkins also implemented a number of safety measures, including by securing rooms for students in nearby hotels in which students would be charged subsidized rates, despite the higher premium costs borne by the university, in order to reduce the number of students sharing rooms and to enhance safety on and around campus. In addition, to avoid the risk inherent in a potential late-autumn resurgence of the virus, Johns Hopkins also announced that in-person instruction for undergraduates would cease after the Thanksgiving holiday, thereby allowing those students to return home to their families without the burden and risks associated with a return to campus to complete the semester.  Taken together, these nuanced, data-driven, fluid decisions and policies are the upshot of hundreds of hours of careful planning over weeks and months by senior administrators across each of Johns Hopkins' several schools, with valuable input from Johns Hopkins' public health specialists.

62.     For Johns Hopkins, increasing the number of in-person sessions in response to an arbitrary dictate—quite different from ongoing exercise of discretion and flexibility, with the benefit of up-to-the-minute inputs and data—would unduly increase the risk to faculty, staff, and students of contracting COVID-19.  While most faculty members are able to provide instruction remotely under the current virtual-learning plans, a fixed commitment to increase and maintain in-person sessions throughout the semester regardless of intervening developments would place these instructors, many of whom fall in at-risk categories, in peril of being infected with COVID-19.  As in other universities,

many faculty members at Johns Hopkins are over 60 years old.  According to the CDC, older adults are at highest risk for severe illness from COVID-19, meaning they are more likely to "require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[23]

63.     Johns Hopkins intends for its faculty members to focus on providing robust and meaningful learning experiences through the online medium.  Requiring those faculty to commit themselves to greater on-campus instruction throughout the upcoming semester would substantially detract from that focus.

64.     Were Johns Hopkins compelled to deviate from its own best judgments about the appropriate number and extent of in-person sessions, this would also increase the risk to staff members—including facilities workers, janitorial staff, support staff, and others—of contracting COVID-19 through increased physical interactions with students and other faculty and staff.  Most of these staff members reside outside of the immediate vicinity of their workplaces and are at risk of spreading the virus as they move across Washington, D.C., and Maryland.

65.     Students will also be at an increased risk of contracting COVID-19 if ICE succeeds in depriving Johns Hopkins' schools and programs of the ability to set their curricula as they see fit based on the unpredictable conditions caused by the COVID-19 pandemic.  Several graduate schools at Johns Hopkins, such as the School of Public Health, include students within an older demographic. Along with faculty members, a good many students fall within groups facing higher risk of infection, whether due to age, immuno-compromised conditions, other underlying conditions such as diabetes, or otherwise.  Indeed, experts at Johns Hopkins' own School of Public Health have advised specifically against further re-opening, and have assisted in creating concrete plans regarding the safest approach to proceeding in the fall 2020 semester.

---

[23]   Ctr. for Disease Control and Prevention, Coronavirus Disease 2019, Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated June 25, 2020).

66.    Students, too, relied on the March 13 Guidance.  Many international students have already incurred substantial, irretrievable costs associated with attending Johns Hopkins in the 2020–2021 academic year.  Students have taken out loans, made travel arrangements to move to or near campuses, and entered leases for housing arrangements there.

67.    Similarly, the university has undertaken great effort and incurred corresponding expense to plan for the return of its international students.  Among other things, it has purchased and secured housing space that would safely accommodate its population of returning students and enable physical-distancing protocols.  If students are unable or unwilling to return as expected, Johns Hopkins has no means of recovering its substantial outlays to date.

**Without Warning, ICE Announces That It Will End The COVID-19 Exemptions**

68.    On July 6, 2020, without employing notice-and-comment rulemaking, or even alerting students or universities in any way that it would be revising its policy, SEVP issued the July 6 Directive, which an accompanying "News Release" described as announcing "modifications . . . to temporary exemptions for nonimmigrant students taking online classes due to the pandemic for the fall 2020 semester."[24]

69.    The July 6 Directive provided that "Nonimmigrant F-1 . . . students attending schools operating entirely online may ***not*** take a full online course load and remain in the United States.  The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States."

70.    Moreover, the July 6 Directive ordered that "[a]ctive students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring

_____

[24]   U.S. Immigration and Customs Enforcement, *SEVP modifies temporary exemptions for nonimmigrant students taking online courses during fall 2020 semester* (July 6, 2020), https://www.ice.gov/news/releases/sevp-modifies-temporary-exemptions-nonimmigrant-students-taking-online-courses-during.

to a school with in-person instruction to remain in lawful status.  If not, *they may face immigration consequences including, but not limited to, the initiation of removal proceedings*."  (Emphasis added.)

71.     The July 6 Directive indicated that the "U.S. Department of Homeland Security plans to publish the procedures and responsibilities . . . in the near future as a Temporary Final Rule in the Federal Register."  As of the filing of this Complaint, no procedures or responsibilities have been published in the Federal Register.

72.     The July 6 Directive further directed that "[s]chools that offer ***entirely online classes or programs*** or ***will not re-open*** for the fall 2020 semester ***must*** complete an operational change plan and submit it to" SEVP "no later than Wednesday, July 15, 2020"—this, despite no notice-and-comment period, no opportunity to respond or provide critical feedback on the consequences of the change, and no purported Temporary Final Rule yet being published.

73.     Moreover, the July 6 Directive stated "[s]tudents attending schools adopting a hybrid model—that is, a mixture of online and in person classes—will be allowed to take more than one class or three credit hours online," provided that for each such student, the school "certif[ies] to SEVP, through the Form I-20, 'Certificate of Eligibility for Nonimmigrant Student Status,' that the program is not entirely online, that the student is not taking an entirely online course load the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program."  Compliance with this requirement would require the university to issue a new Form I-20 for each of its potentially thousands of students on F-1 visas and to do so within 21 business days of the July 6 Directive.  Doing so is not only unduly burdensome, but, in many cases, impossible because students are generally not required to register for particular classes until closer to the start of the semester.  The I-20 forms must be separately signed by both the university and student, under penalty of perjury, in order to certify compliance.  Compliance is subject to auditing, and noncompliance is subject to severe sanctions, carrying long-term consequences.

74.     Neither the July 6 Directive nor its accompanying "News Release" nor the updated "Frequently Asked Questions"[25] document reflects any consideration of key factors that should inform any responsible decision whether to force students holding F-1 visas to attend classes in person as a condition of maintaining their visa status—including when their school has decided to provide classes online only in order to safeguard the health of students, faculty, staff, and the surrounding community.

75.     ICE's Directive reflects no consideration of the effects it will have on the health of students, faculty, staff, or the surrounding communities.

76.     Further, ICE's action of July 6 does not account for the reality that the COVID-19 pandemic continues to this day and that record daily numbers of infections are being reported in the United States.

77.     ICE's action also does not account for the reliance of both students and universities—including Johns Hopkins—on ICE's statements in the March 13 Guidance that the exemptions it announced were due to the COVID-19 pandemic and would be "in effect for the duration of the emergency."

78.     In fact, the July 6 Directive describes changes made in the March 13 Guidance as allowances made "during the height of the Coronavirus Disease (COVID-19) crisis"—entirely disregarding the fact that the present rate of documented cases of infection across the country exceeds that of mid-March by a considerable amount.  And that rate continues to climb.  For instance, in mid-March in the State of Maryland, the rate of additional infections was fewer than 120 over the course of five days (March 15–20); whereas in just one recent 24-hour period (July 8–9) an additional 586 cases have been confirmed.[26]  Likewise, in mid-March, Washington, D.C., saw an increase of approximately 70 cases over the same five-day period; whereas just yesterday an additional 73 cases

---

[25]   U.S. Immigration and Customs Enforcement, *Frequently Asked Questions for SEVP Stakeholders About COVID-19*, https://www.ice.gov/doclib/coronavirus/covid19faq.pdf (last updated July 6, 2020).

[26]   Maryland Dep't of Health, *Coronavirus Disease 2019 (COVID-19) Outbreak*,

have been confirmed.[27]  Nationwide, the delta between March 15 and March 20 totaled fewer than

5,000 cases; yesterday alone, an additional *59,886* cases have been confirmed.[28]

79.    Defendants also failed to consider the absence of other options by which universities

affected by the COVID-19 pandemic and concerned for their students' health and welfare might

provide their curricula to F-1 students.

80.    The July 6 Directive will cause irreparable injury to Johns Hopkins and students on F-1

visas.  For many students affected by the July 6 Directive, it is infeasible or impossible to attempt to

transfer to a program that guarantees an in-person curriculum and therefore allows them to pursue

their education from within the United States on F-1 visa status.  These students therefore are at grave

risk of being forced to leave the country.  The adverse consequences of this sudden displacement are

devastating financially and personally.  In addition to incurring substantial expenses to make

international travel arrangements in the midst of a pandemic that has significantly reduced the

availability of air travel, as well as losing their homes—in many instances at great cost associated with

broken leases—some students will be forced to upend their young children's lives by returning to their

home countries, while others families will be split apart in order to comply with the July 6 Directive.

81.    Continuing F-1 students enrolled in a hybrid program are also at risk of losing their F-1

status by the terms of the July 6 Directive.  That risk is especially great for F-1 students who are

currently outside of the United States, to the extent the students cannot quickly return to the United

States either because of travel restrictions or an inability to get an F-1 entry visa because consular

processing of visa applications has been suspended, to this day, in response to the COVID-19

---

https://coronavirus.maryland.gov/ (last visited July 9, 2020).

[27]  *District of Columbia Coronavirus Case Count*, The New York Times,
https://www.nytimes.com/interactive/2020/us/washington-dc-coronavirus-cases.html (last visited July
9, 2020).

[28]  *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times,
https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited July 10, 2020);
*see also* Coronavirus Resource Center, Johns Hopkins University & Medicine,

emergency.  In turn, these students would lose their ability to pursue pre-completion internship and experiential learning opportunities, as well as their eligibility for work allowances in summer and fall 2021, because these students must maintain F-1 status for the full academic year preceding their access to practical training.  *See* 8 C.F.R. § 214.2(f)(10).  Many of these students have made enormous financial sacrifices to enroll in costly academic programs offered by Johns Hopkins and other institutions—an investment they likely will not recoup if the July 6 Directive impairs their ability to complete their programs.

82.     For students with F-1 visas enrolled in a fully online program, the July 6 Directive prohibits those students from lawfully remaining in the United States to continue their studies.  Unless this Court intervenes, these students will be required to make precipitous arrangements to return to their home countries amidst a worldwide pandemic that has caused nations to close their borders, especially to travelers from the United States, and has considerably limited international travel options.  They must abandon housing arrangements they have made, breach leases, disrupt families, abandon their support networks and academic resources, pay exorbitant air fares, and risk COVID-19 infection on transoceanic flights.  And if they cannot depart timely, they risk detention by immigration authorities and formal removal from the country that may forever mar their records and job opportunities and altogether bar their return to the United States for up to ten years.  *See* 8 U.S.C. § 1182(a)(9).

83.     While students may attempt to participate in their programs online from outside the United States, they face barriers if suddenly uprooted and forced to return home unexpectedly.  In particular, they may have their research and learning inhibited by the absence of reliable Internet connections, or, indeed, any such connections or infrastructure.

---

84.     For Johns Hopkins, losing its international students from its campus community prevents it from fulfilling its academic imperatives.  The value of a Johns Hopkins education depends in large part on the diversity of perspective offered by these international students.  Rendering their participation impossible or insignificant will impair the educational experience for all Johns Hopkins students, deprive the university of their innovative research contributions, stunt the development of scholarship, and undermine Johns Hopkins' mission of bringing the benefits of discovery to the world.  Moreover, Johns Hopkins also depends on some F-1 graduate students for teaching support in its undergraduate programs.  Requiring these students to provide instruction from remote locations in their home countries, potentially with considerable time-zone disparities and variable Internet connectivity, will make it harder for faculty to make effective use of their student teaching aides.

85.     The July 6 Directive will make continued study at Johns Hopkins impracticable for a sizable portion of the university's F-1 visa students.  The loss of the ability to perform research or fieldwork, to study on campus in libraries with extensive academic resources, or even participate in basic coursework under reasonable conditions, will force many students to interrupt their studies.  The predictable result will be that many students will take leaves of absence or withdraw from Johns Hopkins as a direct result of the July 6 Directive.  Such outcomes can be financially disastrous for schools, which often cannot afford severe reductions in class sizes without being forced to drastically cut their enrollment in future terms:  in particular, the Johns Hopkins Carey Business School has an extensive international student body and will face serious financial stress as a result of the number of students who may be forced to withdraw or defer enrollment.

86.     The tremendous uncertainty that the July 6 Directive imposes on F-1 visa holders is especially deleterious.  Pursuant to the Directive, students have been forced to make pivotal decisions—often of great personal and professional significance—by July 15.  This upheaval comes with weighty potential legal ramifications—often due to factors entirely outside the students' control.

Should F-1 students decide to risk their health by enrolling in in-person coursework by July 15, for the sake of complying with the July 6 Directive, their visa status may *still* remain at risk in the event that, for example, state or local authorities respond to a resurgence of the virus sometime during the fall semester by ordering Johns Hopkins to cease all in-person education.  Such a student, having carefully complied with the July 6 Directive, possibly at great personal cost, may suddenly find herself out of compliance with her visa requirements should the Washington, D.C., or Maryland authorities determine that public safety requires transitioning all classes online.  In addition, Johns Hopkins has itself reserved the right to decide to return to fully online classes if public health circumstances so dictate, and the July 6 Directive not only unduly interferes with that right and decisionmaking for the university, but also may result in substantial negative consequences for both Johns Hopkins and its international students.

87.     Such a scenario would only compound the personal risks to F-1 visa holders.  As mentioned previously, the CDC has recognized the dangers of travel during the pandemic.  *See supra* ¶¶ 42–43.  Thus, if the COVID-19 crisis becomes even further exacerbated (as it is widely expected to in the fall),[29] and local or state governments or public health considerations suddenly mandate the closure of Johns Hopkins' in-person instruction, students with F-1 visas within the United States would be forced into the especially precarious position of having to travel during a spike in infections in order to comply with the July 6 Directive mandating that they quickly leave the country just as infections are surging.

---

[29]  *See* John Wagner et al., *Fauci, top health officials warn of covid-19 surge, contradict Trump on testing*, The Washington Post (June 23, 2020), https://www.washingtonpost.com/politics/2020/06/23/fauci-testimony-coronavirus-house/ (citing four top U.S. health officials, including Anthony Fauci and Assistant Secretary for Health Brett Giroir, who "warned [at a Senate hearing] of a difficult fall and winter because the U.S. health-care system will probably battle two highly contagious, respiratory viruses then: the novel coronavirus and the seasonal flu," and "said it was inevitable the country would see more cases as states continued to re-open").

88.     The uncertainty worked by the July 6 Directive therefore imposes not only significant safety risks, but also acute legal risks upon F-1 students.  Should a student suddenly be found out of compliance with her F-1 visa requirements, she faces potential deportation, detention, loss of work authorization, and a blemished legal record that may work serious damage to her professional prospects in the future.  Notably, although students on F-1 visas may be entitled to additional time to prepare for departure after the end of the school year, 8 C.F.R. § 214.2(f)(5)(iv), "an F–1 student who fails to maintain a full course of study without the approval of the DSO or otherwise fails to maintain status is not eligible for an additional period for departure."  *Id*.  Pursuant to the July 6 Directive, a full online course will not suffice, so any F-1 students who either elect a fully remote course load—or even those who *choose* to take in-person classes, but which classes can be terminated at any point by local or municipal authorities—lose the benefit of such a grace period and would be forced to leave the country in short order.

89.     The July 6 Directive will also cause immense harm to Johns Hopkins as a whole. Many of the university's curricular programs depend on the presence and diversity of international students and help our students prepare for the world.  The curriculum at the University's various Schools—from the School of Advanced International Studies to its undergraduate programs to its School of Medicine—draw frequently on the perspectives of international students, including mid-career public officials from around the world who bring unique viewpoints about different approaches to governance and policy.  The absence of such expertise and perspective diminishes the education for the university and all of its students.

90.     Furthermore, by forcing Johns Hopkins into a state of uncertainty over the new regulations, the Directive also threatens Johns Hopkins with legal consequences, including a loss of its SEVP certification—and thus its ability to enroll international students (a crucial demographic for all Johns Hopkins schools).  Indeed, if the SEVP determines that a school is not in compliance with its

reporting requirements, the SEVP can review a school's certification and decide to withdraw it.

8 C.F.R. § 214.3(h)(3)(iii) (review); 8 C.F.R. § 214.4(b)(withdrawal).  When the certification is

withdrawn, schools may, at the SEVP's discretion, effectively be prohibited from enrolling new F-1

students because the school could be prohibited from creating the necessary forms and reports.  8

C.F.R. § 214.4(i).  Furthermore, the SEVP can also deny Johns Hopkins University's SEVP request

for re-certification when the university is required to re-certify two years after the date of the previous

SEVP certification.  *See* 8 C.F.R. § 214.3(h)(2) (recertification on two-year cycles).  In order to be

eligible for re-certification, a school must show that it "has complied during its previous period of

certification or recertification with recordkeeping, retention, and reporting requirements and all other

requirements of paragraphs (g), (j), (k), and (l) of this section."  *Id.* § 214.3(a)(3)(ii)(B).

91.     By creating the risk of withdrawal from Johns Hopkins or deportation, Defendants

have put both the university and its students to an impossible choice:  lose numerous students who

bring immense benefits to the school or take steps to retain those students through a rigid, unvarying

commitment to in-person classes, even to the extent those steps contradict the judgments each school

would otherwise make about how best to protect the health of the entire university community.  Much

like its F-1 students, as a result of the July 6 Directive, Johns Hopkins itself has been placed at the

mercy of factors entirely outside of its control.  Even if the university undertakes the immense burden

of processing thousands of I-20 forms in a timely fashion over a very short period, and alters its

carefully crafted curricula to ensure that in-person options are available at all schools, the university

faces the obvious and unavoidable risk that it may *still* find itself out of compliance with the

Directive.  Specifically, should public health considerations or further government directives force the

university to go purely online in the face of a fall 2020 viral resurgence, Johns Hopkins will be unable

to satisfy conditions of the Directive despite its most Herculean efforts.

92.     The dilemma the Directive poses for Johns Hopkins' overall planning compromises welfare and pedagogy across the university and its entire student body.  As things previously stood, Johns Hopkins had carefully and conscientiously planned—with input from all concerned, including its world-class experts on public health—to put on the best curricula and offerings it could over the course of the upcoming semester, subject to ongoing adjustments and continually balancing the risks from COVID-19 against various educational objectives.  For some programs, that meant a hybrid approach; for others, it meant relying exclusively or predominantly on online classes.  The latter, in some contexts, actually could be preferable from a pedagogical perspective, when compared to the in-class alternative, attended by necessary physical distancing.  For instance, a professor might find it easier (and safer) to review a student's work on a math problem by sharing a screen via Zoom, as opposed to physically peering (at a distance) over the student's shoulder in a classroom.  And it would follow that the online learning opportunity would in some instances be preferred there.  But the Directive now skews the calculus in favor of in-person classes, very likely at the expense of pedagogy as well as potentially public health.  As of today, the July 6 Directive is putting Johns Hopkins to an unfair and perverse choice—Johns Hopkins must either disenfranchise its international students or else compromise its pursuit of its academic mission based on ongoing consideration of data and exercise of academic discretion while it continues to account for and cope with a pandemic.

93.     This problem is compounded by the impenetrable vagueness of the Directive's terms.  For instance, the Directive mandates the university certify that "the program is not entirely online" and "that the student is taking the minimum number of online classes required to make normal progress in their degree program."  What that means is nowhere spelled out, leaving universities only to guess at the requirements for compliance, as well as predict the future of an uncertain and evolving global pandemic—after all, it is impossible for any university to know whether a program will or will not be "entirely online" at the time of certification given that public health requirements may lead

31

governmental authorities to **_mandate that Johns Hopkins and other universities cease in-person_**
**_courses and go back to fully online education_**.

94.     Still worse, recent statements by Administration officials have only added to the
confusion:  Acting Deputy Secretary of Homeland Security Cuccinelli indicated Tuesday that
international students could remain in the United States as long as they receive at least *some* face-to-
face instruction:  "Anything short of 100 percent online classes," he told CNN in an interview.[30]
Again, even if universities undermine their assiduous efforts to create the optimal learning
environment for their students under the circumstances, altering their curricula to provide in-person
instruction, it is still far from clear what level of in-person education precisely will prevent them from
losing their SEVP accreditation—a credential that is vital to Johns Hopkins and other universities in
the program.

95.     Notably, the Administration has acknowledged that ICE's decision is designed to force
universities to conduct in-person classes notwithstanding the considered judgments of university and
public health officials that it may not be safe or educationally advisable to do so in certain
circumstances.[31]  As Mr. Cuccinelli stated on July 7, 2020, the ICE Directive will "encourage schools
to re-open."[32]  ICE's decision also reflects the Administration's continued efforts to limit and reduce
the presence of F-1 international students in the United States.  As recently as this week, President
Trump tweeted insisting upon schools re-opening in the fall,[33] and—just yesterday—emphasized his

---

[30]   Susan Svrluga and Nick Anderson, *Harvard, MIT sue Trump administration to protect student*
*visas, escalating fight over online learning*, Wash. Post (July 8, 2020)
https://www.washingtonpost.com/education/2020/07/08/harvard-mit-international-students-ice/.

[31]   Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM),
https://twitter.com/realDonaldTrump/status/1280209946085339136?s=20.

[32]   John Bowden, *Cuccinelli says rule forcing international students to return home will 'encourage*
*schools to re-open'*, The Hill (July 7, 2020), https://thehill.com/homenews/administration/506248-
cuccinelli-says-rule-forcing-international-students-to-return-home.

[33]   Trump, *supra* note 31 ("SCHOOLS MUST OPEN IN THE FALL!!!").

disagreement with the findings of the nation's leading infectious disease experts.[34]  In the absence of a

clear scientific or public health rationale for its action, one can only conclude that it is driven solely by

ill-considered political motivation.[35]

### CLAIMS FOR RELIEF

### Count I (Violation of Administrative Procedure Act, 5 U.S.C. § 706)
### The July 6 Directive Is Arbitrary and Capricious

96.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

97.     The Administrative Procedure Act prohibits agency action that is arbitrary and

capricious.

98.     An agency regulation is arbitrary and capricious if (among other things) the agency

(1) failed to examine the relevant data and articulate a satisfactory explanation for its action, including

a rational connection between the facts found and the choice made; (2) failed to consider an important

aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence

before it; or (4) defies the text of a statute or reflects an unreasonable interpretation thereof.

99.     The July 6 Directive fails on several grounds.

100.    First, the July 6 Directive is arbitrary and capricious because it fails to articulate any

basis for ICE's action.  The only rationale that Defendants have offered is that "as many institutions

across the country re-open, there is a concordant need to resume the carefully balanced protections

implemented by federal regulations."[36]  The assertion that "many" "institutions" are "re-open[ing]" is

---

[34]   Donald J. Trump (@realDonaldTrump), Twitter (July 8, 2020, 9:33 AM),
https://twitter.com/realDonaldTrump/status/1280857657365200902 ("I disagree with @CDCgov on
their very tough & expensive guidelines for opening schools. While they want them open, they are
asking schools to do very impractical things. I will be meeting with them!!).

[35]   Donald J. Trump (@realDonaldTrump), Twitter (July 8, 2020, 9:16 AM),
https://twitter.com/realDonaldTrump/status/1280853299600789505 ("In Germany, Denmark,
Norway, Sweden and many other countries, SCHOOLS ARE OPEN WITH NO PROBLEMS. The
Dems think it would be bad for them politically if U.S. schools open before the November Election,
but is important for the children & families. *May cut off funding if not open*!" (emphasis added)).

[36]   U.S. Immigration and Customs Enforcement, Broadcast Message: COVID-19 and Fall 2020 (July

so vague as to be meaningless for present purposes.  Whatever it means, however, the July 6 Directive makes no effort to articulate a logical relationship between that premise and Defendants' conclusion that an abrupt change in education policy is warranted.  Defendants' failure to provide a discernible explanation for the July 6 Directive renders the action arbitrary and capricious.

101.   Separately, the July 6 Directive is arbitrary and capricious because it entirely fails to consider an important aspect of the problem facing the agency.  The Directive makes no mention of the dilemma it foists upon universities like Johns Hopkins and its students, faculty, and staff.  After months of careful deliberation, scrupulous planning, and close attention to local conditions at Johns Hopkins, the university's schools and other programs adopted tailor-made plans of operation for the fall semester.  These plans carefully balance the health and safety of faculty, students, staff, and their respective families with Johns Hopkins' and its various programs' educational imperatives.  The July 6 Directive scuttles these plans and imposes a harsh, arbitrary paradigm that forces Johns Hopkins to choose between, on the one hand, preserving the physical health and safety of its community by its own best lights, or, on the other, fulfilling an educational mission that is predicated upon its international students remaining in the United States.  Moreover, the Directive utterly fails to consider the fact that, far from being over or substantially reduced, the COVID-19 pandemic is at its height in the United States.  That is precisely why the agency acted in an arbitrary and capricious manner when it attempted to depart from the March 13 Guidance, which was promised to be in effect during the pendency of the national emergency.

102.   Additionally, the July 6 Directive is arbitrary and capricious because it fails to address the serious reliance interests that Defendants' prior guidance engendered.  Defendants' change in policy required them, at a minimum, to address past practice regarding the SEVP and to supply reasoned analysis for their about-face.  But they failed to do so.  The July 6 Directive departs from

6, 2020), https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf.

prior guidance that ICE issued on this subject, including the explicit assurance on March 13 that the exemptions for F-1 visa holders due to COVID-19 would be "in effect for the duration of the emergency," without any analysis of how universities like Johns Hopkins and its students were relying on that assurance.  This renders Defendants' action arbitrary and capricious.

103.    To the extent there is any colorable explanation for the Directive, it must implicitly be that the emergency ICE acknowledged in its March 13 Guidance has passed.  That emergency posed by COVID-19 is what expressly drove the issuance of the March 13 Guidance, and would remain ICE's lodestar for any future guidance.  That is, once the emergency ended, so might the March 13 Guidance.  But in the absence of any change in the condition giving rise to the March 13 Guidance— the emergency posed by the pandemic itself—it is arbitrary and capricious for ICE nonetheless to abandon such Guidance at a time when the COVID-19 emergency was worsened, not dissipated, according to the available data.  This is a quintessential example of agency arbitrariness and caprice.

104.    The only substantive explanation for the July 6 Directive is a constitutionally invidious one.  Instead of bearing any rational relationship to public health or pedagogy, the Directive effectuates a desire by the President to make universities like Johns Hopkins bend their academic enterprise for political purposes.  That is how and why the President and his Administration are holding hostage students' visa status:  to use them as leverage by which to force the country's universities to re-open, without regard for public health, student safety, or actual learning.[37]  Far from providing a valid justification for agency action, such reasoning poses grave constitutional offense.

105.    For these reasons and others, the July 6 Directive is arbitrary and capricious and violates the Administrative Procedure Act.

### Count II (Violation of Administrative Procedure Act, 5 U.S.C. § 706)
### The July 6 Directive is not in Accordance with Law

106.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

---

[37]    *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (July 8, 2020, 9:330 AM),

107.    The Administrative Procedure Act prohibits agency action that is not in accordance with law.

108.    By compelling Johns Hopkins to increase its use of in-person instruction or else suffer irreparable harm, the July 6 Directive defies established law acknowledging that the United States is in the midst of a national crisis resulting from the COVID-19 pandemic.

109.    The President declared on March 13, 2020 that "the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020."[38]  That followed a similar declaration from the Secretary of Health and Human Services, who determined on January 31, 2020 that, "as a result of confirmed cases of 2019 Novel Coronavirus . . . a public health emergency exists and has existed since January 27, 2020, nationwide."[39]  The President's declaration on March 13 gave "HHS important powers to enhance state and local communities' ability to respond to the outbreak."[40]

110.    On March 13, 2020, the same day that the President declared a national emergency, ICE announced that, as a result of the COVID-19 pandemic, students holding F-1 visa status enrolled only in online courses would not lose their immigration status.[41]  The announcement stated that "[t]his temporary provision is only in effect for the duration of the emergency."

---

https://twitter.com/realDonaldTrump/status/1280857657365200902 (emphasis added).

[38]    Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[39]    Dep't of Health and Human Serv., *Determination That a Public Health Emergency Exists* (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.

[40]    Dep't of Health and Human Serv., *Statement from HHS Secretary Azar on President Trump's National Emergency Declaration* (Mar. 13, 2020), https://www.hhs.gov/about/news/2020/03/13/statement-from-hhs-secretary-azar-on-president-trumps-national-emergency-declaration.html.

[41]    U.S. Immigration and Customs Enforcement, *COVID-19: Guidance for SEVP Stakeholders* (Mar. 13, 2020), https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf.

111.    By making international students taking an "entirely online course load" ineligible for F-1 visas, the July 6 Directive contravenes ICE's March 13 Guidance.  But the July 6 Directive does not purport to rescind, reconsider, or otherwise amend the March 13 announcement.  It simply proceeds on the unexplained, indefensible premise that the national emergency that prompted the March 13 Guidance has passed.  That premise, however, contradicts not only reason but also law: both the President's March 13 declaration of a national emergency and the Secretary of Health and Human Services' January 27 determination continue in effect today.

112.    Insomuch as the July 6 Directive is contrary to the Administration's own declaration and determination of a national emergency and the acknowledgement of same in ICE's March 13 Guidance, it is contrary to law.

### Count III (Violation of Administrative Procedure Act, 5 U.S.C. §§ 553, 706)
### The July 6 Directive Was Promulgated Without Observance of Procedure Required by Law

113.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

114.    The Administrative Procedure Act requires a federal agency to notify interested parties of any rule it proposes adopting.  The notice must include enough detail of the regulation's content, and of its factual and legal basis, so as to allow for meaningful and informed comment by interested parties.  An agency commits disabling procedural error when it fails to reveal portions of the factual basis underlying a regulation.

115.    The July 6 Directive issued by ICE is a rule within the meaning of the Administrative Procedure Act because it is an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.

116.    The July 6 Directive is not an interpretative rule, general statement of policy, or rule of agency organization, procedure, or practice.  Instead, it is a substantive rule that alters the rights and obligations of students and universities under the law.

117.    Absent good cause for not doing so, ICE was required to provide notice of its proposal, an opportunity for public comment, and an explanation of the rule ultimately adopted.  Its failure in this regard should be fatal in and of itself.  Nor has ICE even attempted to make a reasoned "good cause" finding for failing to follow the APA's procedural requirements here.

118.    Although dressed in the guise of a "Temporary Rule," the Guidance effectuates important change and carries profound ongoing and permanent effects for universities and their students, and is final for relevant purposes—particularly for the academic semester and year now about to commence.  ICE has offered no justification for failing to afford any semblance of the process and deliberation that would be associated with a final rule.

119.    Defendants' failure to provide notice and an opportunity to comment prior to promulgating the July 6 Directive violates the Administrative Procedure Act.

### Count IV (Due Process)
### Failure To Provide Notice and an Opportunity to be Heard and Void for Vagueness

120.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

121.    The Due Process Clause of the Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  At its core, due process promises both effective notice and a meaningful opportunity to be heard.

122.    Notice of a deprivation of a property interest must convey sufficient information for interested parties to have an opportunity to present their objections.  In other words, due process requires that a party facing deprivation of its property be given notice of the case against it.

123.    The opportunity to be heard must (barring exceptional circumstances not present here) *precede* the deprivation.  And, at a minimum, a party being deprived of property must have a meaningful opportunity to present its case to a neutral decisionmaker.

124.    Similarly, administrative rules that fail to provide regulated parties fair notice of what is required of them, or lack the precision and guidance necessary to ensure that those enforcing the

law do not act in an arbitrary or discriminatory way, are too vague to be enforced consistent with the Due Process Clause.

125.    The July 6 Directive deprives Johns Hopkins and its students of property interests, including (among other things) (i) the benefit of its intensive, months-long effort to craft a sensible and safe plan for providing education to its students; (ii) tuition payments from international students who will choose not to enroll because doing so from outside the United States is impractical, impossible, or not equivalent to the educational program to which they applied; (iii) resources required to recertify nearly 5,000 students' I-20 forms in compliance with the July 6 Directive, which would require, at a minimum, 1,000 hours of work diverted from other responsibilities, *every time* there is a change in the university's instructional model; (iv) investments made in affording housing and educational opportunities that international students would now be precluded from availing themselves of and paying for; and (v) possible loss of one or more programs that depend on international students as their life blood.

126.    Defendants provided no notice whatsoever of this deprivation.  The July 6 Directive was issued on the first business day after Independence Day (without any prior indication that ICE was considering a change in position), little more than a week before a July 15 decision was due as to online education, and only weeks before the fall semester was scheduled to begin.

127.    Nor have Defendants provided a meaningful opportunity to be heard.  There is no indication that the July 6 Directive is merely under consideration or open for debate.  It states Defendants' new policy as it will be enforced, on pain of deportation and life-altering sanctions, starting this week.  Johns Hopkins never had an opportunity to contest the deprivation, to persuade ICE to retain the position it announced on March 13, or even to explain the need, at a bare minimum, for clear guidance and opportunity to plan.

128.    Defendants' absence of process not only deprived Johns Hopkins of constitutional rights, but it also resulted in a rule that is hopelessly vague and leaves Johns Hopkins mystified as to how it and its students are meant to comply, even as signed certifications of compliance, under penalty of perjury, will be coming imminently due.  In particular, the July 6 Directive fails to provide adequate notice of what Johns Hopkins and its international students must do to retain their F-1 visa status.  The July 6 Directive requires Johns Hopkins to certify that international students are not taking an "entirely online course load," but it provides no guidance regarding what qualifies as in-person instruction sufficient to make a student's course load not "entirely online."  These indeterminate standards illustrate the danger of vague regulations—danger that is compounded by the inability to comment and alert ICE to the practical questions that need to be answered, clearly and right up front, in order for universities to understand their obligations and plan.

129.    While left bereft of key specifics and in the dark as to what ICE envisions, Johns Hopkins can only speculate about what is required for its thousands of international students to qualify for F-1 visas, while left at the mercy of ICE.  Depending on how it subsequently construes and applies its cryptic guidance, ICE may at its discretion reject Johns Hopkins' determinations and even potentially fault and sanction Johns Hopkins during an audit process for perceived noncompliance and purported false statements in the Form I-20 certification process, including by removing Johns Hopkins from the SEVP.  Its students, meanwhile, could face significant penalties, including deportation and removal of visa eligibility for up to ten years under 8 U.S.C. § 1182(a)(9).

130.    ICE violates the Due Process Clause by taking such a hide-the-ball approach to regulating sensitive immigration matters that carry such momentous stakes for universities and students whose programs, degrees, and futures depend on understanding and following agreed parameters.

**Count V (Unconstitutional Conditions)**
**The July 6 Directive Requires Forced Assembly as a Condition of Receiving F-1 Visa Status and Usurps Academic Freedom in Violation of the First Amendment**

131.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

132.    The government may not require a person to give up a constitutional right in exchange for a discretionary benefit conferred by the government.

133.    The Academy enjoys unique constitutional status.  Universities' educational autonomy falls under the protective umbrella of the First Amendment to the United States Constitution.   Part and parcel of that educational autonomy is educators' exercise of discretion—and discharge of responsibility—to balance the pursuit of their institutions' academic mission with the health and safety of students under their care.  Indeed, nothing can be more sacrosanct within the Academy.

134.    The July 6 Directive upends this constitutional principle and does violence to the notion that universities should be left free to determine for themselves how best to educate their students.  Specifically, the July 6 Directive impermissibly cudgels Johns Hopkins to forsake its carefully calibrated judgment—informed by the world's leading scientists and COVID-19 experts—about the scheduling and delivery of educational content.  Only by caving to ICE's drastic edict and revising its careful planning can Johns Hopkins protect international students from being summarily stripped of their immigration status and forced to flee the country.  At bottom, the July 6 Directive conditions the ability of Johns Hopkins' international students to enter or remain in the United States—and by extension, the university's ability to carry out its academic function and mission—on the forced transfer from the university to the government of the right to make protected academic judgments and determine how and under what conditions to provide instruction.  That is impermissible.

135.    Relatedly, the July 6 Directive forces international students to choose between enjoying the benefits of their educational visas and exposing themselves to greater risk of contracting

a potentially deadly and incurable disease.  The government is wrong to impose that choice, and its attempt to do so is flatly unconstitutional.

## PRAYER FOR RELIEF

Wherefore, Johns Hopkins respectfully seeks the following relief:

1.      A temporary restraining order and preliminary and permanent injunctive relief preventing Defendants from enforcing the policy announced in ICE's July 6 Directive, or promulgating it as a Final Rule;

2.      An order vacating and setting aside the policy announced in the July 6 Directive and reinstating the March 13 Guidance;

3.      A declaration that the policy announced in the July 6 Directive is unlawful;

4.      An order awarding Plaintiff its costs and attorney's fees; and

5.      Any and all other such relief as the Court may deem appropriate.

DATED:  July 10, 2020                    Respectfully submitted,

                                         QUINN EMANUEL URQUHART & SULLIVAN LLP


                              By    */s/ William A. Burck*
                                 _____
                                 William A. Burck (D.C. Bar No. 979677)
                                 Derek L. Shaffer (D.C. Bar No. 478775)
                                 1300 I Street NW, 9th Floor
                                 Washington, DC 20005
                                 (202) 538-8000
                                 williamburck@quinnemanuel.com
                                 derekshaffer@quinnemanuel.com

                                 Kathleen M. Sullivan*
                                 Crystal Nix-Hines*
                                 Shon Morgan*
                                 Marina Lev*
                                 865 S. Figueroa Street, 10th Floor
                                 Los Angeles, CA 90017
                                 (213) 443-3000
                                 kathleensullivan@quinnemanuel.com
                                 shonmorgan@quinnemanuel.com
                                 crystalnixhines@quinnemanuel.com
                                 marinalev@quinnemanuel.com

                                 *Applications for admission *pro hac vice* to be filed

                                 *Attorneys for Plaintiff*
                                 *Johns Hopkins University*