## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHNS HOPKINS UNIVERSITY**; <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF HOMELAND SECURITY**; <br><br> **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**; <br><br> **CHAD WOLF**, in his official capacity as Acting Secretary of the U.S. Department of Homeland Security; and <br><br> **MATTHEW ALBENCE**, in his official capacity as Acting Director of the U.S. Immigration and Customs Enforcement; <br><br> Defendants. | Case No. 20-cv-1873 |

## MEMORANDUM IN SUPPORT OF
## JOHNS HOPKINS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iv

Introduction ......................................................................................................................... 1

Background ........................................................................................................................... 4

    A.    Johns Hopkins, The COVID-19 Pandemic, And The Government's Response ...... 4

    B.    Johns Hopkins' Preparation For The Fall 2020 Semester ........................................ 7

    C.    The July 6 Directive ................................................................................................ 9

    D.    The Impact Of ICE's Change In Policy ............................................................... 12

Legal Standards .................................................................................................................. 16

Argument ............................................................................................................................ 17

I.    Johns Hopkins Is Likely To Prevail On The Merits .................................................... 17

    A.    The July 6 Directive Is Arbitrary And Capricious ................................................ 17

        1.    The government failed to articulate any rationale (let alone a plausible one) for the July 6 Directive ................................................................... 18

        2.    The July 6 Directive fails to consider important aspects of the problem ... 21

        3.    The July 6 Directive fails to consider Johns Hopkins' and its students' reliance on ICE's prior guidance ............................................................. 23

    B.    The July 6 Directive Is "Otherwise Not In Accordance With Law" ..................... 25

    C.    The Government Violated The APA By Failing To Provide Notice Or A Meaningful Opportunity For Comment On The July 6 Directive ......................... 26

    D.    Both The July 6 Directive And The Process That Produced It, Violate The Due Process Clause ................................................................................................ 29

        1.    The government failed to provide notice and an opportunity to be heard . 29

        2.    The July 6 Directive is void for vagueness ............................................... 33

    E.    The July 6 Directive Usurps Academic Freedom And Imposes Unconstitutional Conditions ............................................................................................................ 35

II.    Absent An Injunction, Johns Hopkins Will Suffer Irreparable Harm ............................. 38

III.    The Balance Of Equities And Public Interest Weigh Heavily In Favor Of Enjoining The
        July 6 Directive ................................................................................................................43

Conclusion ................................................................................................................................45

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Med. Ass'n v. Reno*,
    57 F.3d 1129 (D.C. Cir. 1995)..................................................... 26

*Am. Mining Congress v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993).................................................. 28

*Am. Radio Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008).................................................... 26

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
    490 F.3d 1(1st Cir. 2007) ........................................................... 36

*Autor v. Pritzker*,
    740 F.3d 176 (D.C. Cir. 2014).................................................... 35

*Bean LLC v. John Doe Bank*,
    291 F. Supp. 3d 34 (D.D.C. 2018) ............................................. 16

*Board of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972).................................................................... 30

*Boddie v. Connecticut*,
    401 U.S. 371 (1971).................................................................... 29

*Brendsel v. Office of Federal Housing Enterprise Oversight*,
    339 F. Supp. 2d 52 (D.D.C. 2004) ............................................. 42

*Butera v. District of Columbia*,
    235 F.3d 637 (D.C. Cir. 2001).................................................... 31

*Cal. Democratic Party v. Jones*,
    530 U.S. 567 (2000).................................................................... 37

*Chamber of Commerce of the United States v. SEC*,
    443 F.3d 890 (D.C. Cir. 2006).................................................... 27

*City & Cty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018).................................................... 43

*Comm. of 100 on Fed. City v. Foxx*,
    87 F. Supp. 3d 191 (D.D.C. 2015) ............................................. 16

*Conn. Light & Power Co. v. Nuclear Regulatory Comm'n,*
    673 F.2d 525 (D.C. Cir. 1982) ........................................................................ 27

*Continental Training Svcs., Inc. v. Cavazos,*
    893 F.2d 877 (7th Cir. 1990) ......................................................................... 31

*Davis v. District of Columbia,*
    158 F.3d 1342 (D.C. Cir. 1998) ..................................................................... 38

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ................................................................................... 21

\**Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ......................................................... 18, 20, 21, 24, 25

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994) ....................................................................................... 36

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975) ....................................................................................... 41

*E. Bay Sanctuary Covenant v. Barr,*
    391 F. Supp. 3d 974 (N.D. Cal. 2019) ........................................................... 43

\**Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ................................................................ 17, 18, 19, 24

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ....................................................................................... 33

*Fuentes v. Shevin,*
    407 U.S. 67 (1972) ......................................................................................... 29

*Glossip v. Gross,*
    135 S. Ct. 2726, 2736 (2015) ........................................................................ 16

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013 .................................................................. 38, 43

*Goss v. Lopez,*
    419 U.S. 565 ................................................................................................... 30

*Gray Panthers v. Schweiker,*
    652 F.2d 146 (D.C. Cir. 1980) .................................................................. 30, 31

*Home Box Office, Inc. v. FCC,*
    567 F.2d 9 (D.C. Cir. 1977) ........................................................................... 26

*Int'l Long Term Care. v. Shalala,*
    947 F. Supp. 15 (D.D.C. 1996) ...................................................................... 41

*J.E.C.M. by & Through His Next Friend Saravia v. Lloyd,*
    352 F. Supp. 3d 559 (E.D. Va. 2018) .......................................................... 25

*Karem v. Trump,*
    960 F.3d 656 (D.C. Cir. 2020)........................................................... 33, 35, 42

*Keyishian v. Board of Regents,*
    385 U.S. 589 (1967)........................................................................... 31, 31, 36

*Kirwa v. United States Dep't of Def.,*
    285 F. Supp. 3d 21 (D.D.C. 2017) ................................................................ 41

*Klayman v. Obama,*
    957 F. Supp. 2d 1 (D.D.C. 2013) .................................................................. 43

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982).......................................................................................30

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)................................................................................ 29, 32

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015)...................................................................................23

*Morrissey v. Brewer,*
    408 U.S. 471 (1972)...................................................................................... 29

*N.L.R.B. v. Catholic Bishop of Chicago,*
    440 U.S. 490 (1979)...................................................................................... 21

*Nat'l Ass'n for the Advancement of Colored People v. Trump,*
    298 F. Supp. 3d 209 (D.D.C. 2018) ....................................................... 18, 24

*Nat'l Lifeline Ass'n v. FCC,*
    921 F.3d 1102 (D.C. Cir. 2019)..................................................... 18, 19, 24

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*
    138 S. Ct. 1365 (2018)............................................................................ 34, 37

*Omnipoint Corp. v. F.C.C.,*
    78 F.3d 620 (D.C. Cir. 1996)........................................................................ 28

*Petties v. District of Columbia,*
    881 F. Supp. 63, 68 (D.D.C. 1995) .............................................................. 41

*Physicians for Soc. Responsibility v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020) ........................................................................ 18

*Propert v. District of Columbia*,
   948 F.2d 1327 ................................................................................ 30, 31

*Public Citizen v. Fed. Motor Carrier Safety Admin.*,
   374 F.3d 1209 (D.C. Cir. 2004) ........................................................................ 19

*R.I.L.-R v. Johnson*,
   80 F. Supp. 3d 164, 191 (D.D.C. 2015) ................................................................ 43

*\*Regents of the University of California v. Bakke*,
   438 U.S. 265 (1978) ................................................................ 31, 31, 36

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ........................................................................ 37

*Simms v. District of Columbia*,
   872 F. Supp. 2d 90 (D.D.C. 2012) ........................................................................ 32

*Soundboard Ass'n v. FTC*,
   254 F. Supp. 3d 7, (D.D.C. 2017) ........................................................................ 16

*\*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) ................................................................ 31, 31, 36

*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015) .................................................................... 43

*TD Int'l, LLC v. Flesichmann*,
   639 F. Supp. 2d 46 (D.D.C. 2009) ........................................................................ 41

*Tri Cnty. Indus., Inc. v. District of Columbia*,
   104 F.3d 455 (D.C. Cir. 1997) ........................................................................ 31

*United States v. Bolton*,
   No. 20 Civ. 1580 (RCL), 2020 WL 3401940 (D.D.C. June 20, 2020) .......................... 17

*United States v. Cotton*,
   760 F. Supp. 116 (D.D.C. 2011) ........................................................................ 28

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ........................................................................ 39

*Wise v. United States*,
   128 F. Supp. 3d 311 (D.D.C. 2015) ........................................................................ 38

**Statutes**

5 U.S.C. § 551 .................................................................................................................. 28

5 U.S.C. § 553 .......................................................................................................... 26, 28

8 U.S.C. § 1182 ................................................................................................................ 34

**Rules**

Fed. R. Civ. P. 65 ............................................................................................................ 16

**Other Authorities**

Executive Office of the President, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), 85 Fed. Reg. 15,337 ....................................................................................................... 5

U.S. Const. amend. V ...................................................................................................... 29

## INTRODUCTION

Plaintiff Johns Hopkins University respectfully seeks a temporary restraining order followed by a preliminary injunction in order to protect its programs and students against imminent irreparable harm, particularly from a looming July 15, 2020 deadline that threatens visa revocation and expulsion *en masse* of international students studying in the United States, absent a return to in-person classes.[1]   Specifically, Johns Hopkins requests that the Court suspend the effectiveness of a new directive issued on July 6, 2020—without notice and comment—that reverses a rule for visa holders that Defendants previously stated would remain "in effect for the duration of the [COVID-19] emergency."

Since March, Johns Hopkins and its many international students had been operating under and relying upon the guidance previously issued by U.S. Immigration and Customs Enforcement ("ICE"), which permitted international students on F-1 visas to safely pursue remote learning throughout the pandemic.   Relying on this guidance, consultations with public health and other experts, and real-time data drawn from its preeminent Coronavirus Resource Center (which aggregates data from all 3,141 counties in the United States and more than 188 countries worldwide), Johns Hopkins developed a comprehensive and nuanced re-opening plan for all of its students and programs.   But these carefully crafted plans, which included both remote and hybrid in-person learning, were upended on July 6 when ICE suddenly announced a

---

[1]   Consistent with the exigencies noted herein, Johns Hopkins filed its complaint requesting a temporary restraining order and preliminary injunction shortly before 4 pm Eastern time this past Friday, July 10.   Shortly thereafter, the undersigned counsel alerted relevant Justice Department attorneys for the United States—including one who is defending against a parallel challenge that Harvard and MIT have filed in U.S. District Court for the District of Massachusetts and who acknowledged receipt—to both the Complaint and the fact that the instant papers seeking a temporary restraining order and preliminary injunction would be filed this morning. Declaration of Derek L. Shaffer ¶¶ 2–6 (July 13, 2020).   Under the schedule operative in Massachusetts, the government will be responding there today and a TRO hearing will be held tomorrow afternoon at 3pm Eastern.   *Id.*, Ex. 4, at 3, 10.

seismic change to its visa policy without offering any notice or opportunity for comment whatsoever.

Although the COVID-19 pandemic has been spreading at increasing rates since the President's March 13, 2020 declaration of a national emergency, ICE inexplicably decrees that international students will lose their F-1 visas unless they and their universities can truthfully certify, under penalty of perjury, that their classes will involve an in-person component and they can then abide by that certification throughout the coming semester.   If a university will conduct any of its programs exclusively online, it must so submit to ICE by July 15 (this Wednesday), merely *nine days* after ICE issued its directive.   Alternatively, if a university intends to use a hybrid model combining in-person and online classes, it must so submit to ICE by August 1. And, if a university wants to try to preserve F-1 visa eligibility, then it and all of its international students must further submit I-20 forms by August 4 certifying, alongside the university, that they will be complying with ICE's guidance, including the requirement that they continue physically attending classes throughout the coming semester, irrespective of any health and safety concerns in place on August 4 or that may arise throughout the semester.

The upshot throws higher education into turmoil, puts universities and students in an impossible (and dangerous) position, and disenfranchises countless international students who enrich and enliven the campuses they call home.   Defendants have put universities and their students to an impossible Hobson's choice:   lose numerous students who bring immense benefits to the university community or take steps to retain those students through a rigid, unvarying commitment to in-person classes, even to the extent those steps contradict the judgments schools would otherwise make about how best to educate their students while protecting the health of their broader communities.   ICE's Directive visits numerous types of

irreparable harm upon international students, as attested to in accompanying declarations, including by separating them from their families here; wasting the time and money they have sunk into their degrees; and exposing them to the risk of COVID-19 without regard for pre-existing conditions and other health indicators.   Moreover, by targeting international students for expulsion, Defendants' July 6 Directive jeopardizes the country's longstanding commitment to harnessing the ideas, energies, and creativities of people from around the world.   The United States' role as a place where raw talent and ambition matter far more than one's country of origin is one of its greatest strengths.   Research universities like Johns Hopkins play an integral role in enhancing the country's dynamism and competitiveness precisely because they attract and nurture great talent and ambition in students who span the globe.

The July 6 Directive should be invalidated because it is contrary to law, to reason, and to core American values.   It is arbitrary and capricious in the extreme.   It makes no sense.   Far from expiring, the COVID-19 emergency that animated the March guidance has only worsened with record-shattering rates.   Relatedly, ICE's new directive is contrary to law insomuch as it defies Executive Orders that continue to recognize the national emergency still posed by COVID-19.   As a procedural matter, ICE has violated both the Administrative Procedure Act and due process by promulgating such a momentous change without affording the slightest opportunity for notice or comment—or the coherence or clarity required to enable compliance. Last and not least, ICE is imposing an unconstitutional condition:   universities cannot constitutionally be made to forfeit their academic freedom and control over pedagogy, to the point of compromising the physical safety and well-being of the students for whom they are responsible, as a condition of being eligible to admit international students.   Whatever the government's purported defenses may be, this suit is likely to succeed on its merits.

There is no way to understand the policy under challenge without recognizing the political motivation behind it.   As confirmed by the public statements by members of the Administration, including the President, that motivation is to force universities to reopen in-person classes, irrespective of university officials' assessments of the public health risks and at the expense of international students.   Unable to control universities' decisionmaking directly, the Administration has instead put them in a coercive vise at the expense of international students and their institutions.   In light of the impending harms caused by Defendants' highly suspect action, we ask now simply that the Court press the pause button on ICE's new directive while this litigation proceeds expeditiously.

## BACKGROUND

### A.   Johns Hopkins, The COVID-19 Pandemic, And The Government's Response

Founded in 1876, Johns Hopkins is one of the nation's premier academic and research institutions.   It has approximately 27,000 students and is comprised of nine academic divisions, 11 campuses, and more than 260 programs in the arts and music, humanities, social and natural sciences, engineering, international studies, education, business, and health professions. Compl. ¶ 33.   Two hallmarks of Johns Hopkins are its focus on international studies and its unparalleled expertise in public health.   Compl. ¶ 34.

Johns Hopkins has taken on particular significance since the COVID-19 pandemic began. The school is the leading source of data regarding the pandemic, aggregating data from more than 188 countries or regions to track and model the fast-moving disease.   Compl. ¶ 59.   Johns Hopkins' experts in global public health, infectious disease, and emergency preparedness have been at the forefront of the international response to COVID-19, and the Johns Hopkins University Coronavirus Resource Center has been extensively cited as the basis for government decisions and key reporting, including by Defendant Department of Homeland Security, the

Centers for Disease Control and Prevention, the White House, the United Nations, various state and local governments, major journalistic publications, and Defendants themselves.  *Id.*  The statistics on the pandemic Johns Hopkins has published have been sobering:   over 12.2 million people infected worldwide and more than half a million deaths attributable to COVID-19.  Compl. ¶ 3.   In recent days, according to the Johns Hopkins database, the United States has crossed the grim milestone of 3 million infections and over 133,000 deaths.   *Id.*

The government has recognized the crisis posed by the COVID-19 pandemic.   For example, on March 13, 2020, the President declared a national emergency in response to it.  Executive Office of the President, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), 85 Fed. Reg. 15,337.   That followed a corresponding declaration from the Secretary of Health and Human Services, who determined on January 31, 2020 that, "as a result of confirmed cases of 2019 Novel Coronavirus . . . a public health emergency exists and has existed since January 27, 2020, nationwide."   Dep't of Health and Human Servs., *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://tinyurl.com/smjl72r.[2]   And in March 2020, Congress passed and the President signed the Coronavirus Aid, Relief, and Economic Security Act, a $2 trillion economic stimulus package "[t]o provide emergency assistance and health care response for individuals, families, and businesses affected by the 2020 coronavirus pandemic."   CARES Act, S. 3548, 116th Cong. (2020).

Efforts to contain the spread of this highly contagious disease have included broad shutdowns of society.   On March 16, 2020, the CDC and members of the national Coronavirus

---

[2]    Unless otherwise noted, internal citations, quotation marks, and alterations have been removed from citations in this brief.   Also, for ease of reference, we have shrunk lengthy website references using tinyURL.com.

Task Force issued guidance advising individuals to adopt far-reaching physical distancing measures by, for example, working from home; dispensing with discretionary travel, shopping trips, and gatherings of more than 10 people; and avoiding bars, restaurants, and food courts. *See* The President's Coronavirus Guidelines for America, coronavirus.gov, https://tinyurl.com/v9kngde (last visited July 13, 2020).

Following this advice, many jurisdictions, including Maryland and the District of Columbia, recognized the need to take dramatic steps to protect the health and safety of their residents from human-to-human and surface-to-human spread of COVID-19.   Compl. ¶¶ 4, 44. Among other things, they issued orders suspending or severely curtailing operations of non-essential businesses, schools, and other locations where individuals congregate.   *Id.*

Notwithstanding these mitigation measures, COVID-19 cases continue to rise nationwide.   The current regulatory guidance nationwide, including in Maryland and the District of Columbia, reflects a general policy of continued caution, and a particular concern with indoor gatherings.   Compl. ¶ 45.   Notably, states that have relaxed physical distancing measures, including by allowing indoor gatherings and the opening of locations where individuals congregate—such as Texas, Arizona, California, and Florida—provide a cautionary tale.   *Id.*   Such states are now seeing renewed surges and record-setting numbers of COVID-19 cases, hospitalizations, and reduced but continuing deaths.   *Id.*

In the midst of the world's response to COVID-19 and on the same day the President declared a national emergency, the Student and Exchange Visitor Program ("SEVP"), a division of ICE, issued guidance concerning certain nonimmigrant student visas, known as F-1 visas (the "March 13 Guidance").   Shaffer Decl., Ex. 2.   In its March 13 Guidance, ICE recognized the pandemic and responded to "inquiries concerning the proper status" of international students in

the United States on academic visas "who may have [to] face slightly different scenarios related to emergency procedures implemented by SEVP-certified learning institutions."   *Id.*

As relevant here, the March 13 Guidance addressed the status of students attending a school that "temporarily stops in-person classes but implements online or alternate learning procedures."   *Id.*   Such students, the Guidance explained, could "participate in online or other alternate learning procedures and remain in active status" with SEVP.   *Id.*   Accordingly, students could participate in remote learning implemented as a result of the pandemic—either in the United States or abroad—while retaining their visa status.   *Id.*   The March 13 Guidance indicated that it was a "temporary provision" that would remain "***in effect for the duration of the emergency***."   *Id.* (emphasis added).

## B.   Johns Hopkins' Preparation For The Fall 2020 Semester

Since March 2020, Johns Hopkins has engaged dozens of formal and informal committees and groups to inform its response to the pandemic, including a Health Advisory Group comprised of expert Johns Hopkins faculty who advise the university's senior leadership on COVID-19 issues and ways to continue safely carrying out Johns Hopkins' academic mission. Declaration of Sunil Kumar ¶ 8 (July 12, 2020); Declaration of Stephen Gange Decl. ¶ 6 (July 12, 2020); Compl. ¶ 56.   Senior university leadership has also been conferring weekly, and at times daily, to ensure that the various schools within Johns Hopkins are able to continue providing their high-quality education and research in a remote environment and consistent with public health guidance.   Kumar Decl. ¶ 8; Gange Decl. ¶ 6; Compl. ¶ 56.   On May 5, 2020, the university launched a planning task force, which included six primary work groups—the Research Work Group, Academic Programs Work Group, Student Life Work Group, Health & Safety Work Group, Cross-Cutting Work Groups, and Advisory Groups—composed of 23 separate interdisciplinary teams from across the university, including faculty, staff, and students.

Gange Decl. ¶ 7; Compl. ¶ 57.   Over the next eight weeks, each work group evaluated and documented options for a return to campus and provided the university's deans with broad outlines of how campus operations might be conducted safely so that each school, department, and program could in turn develop detailed plans cued to its individual needs and circumstances. Gange Decl. ¶ 7; Compl. ¶ 57.   "In formulating, adopting, and implementing plans for the fall 2020 semester, Johns Hopkins relied on ICE's assurance that the March 13 Guidance would continue so long as the COVID-19 crisis remained in effect."   Kumar Decl. ¶ 14; *see also* Gange Decl. ¶ 15; Compl. ¶ 55.

Flexibility and data-driven responsiveness have been the hallmarks of Johns Hopkins' COVID-19 response.   Kumar Decl. ¶ 9.   Based in part on the university's status as the world's foremost data source regarding the COVID-19 pandemic, Johns Hopkins benefits from up-to-the-minute, world-leading expertise and data regarding the pandemic.   *Id.*   Johns Hopkins can thus make real-time decisions based on the best information available about the disease and its spread.   *Id.*   Johns Hopkins has committed to making every effort to provide high-quality instruction as it normally would, consistent with the precautions appropriate at any given time. *Id.*   In line with this approach, individual Johns Hopkins academic divisions have adopted varying plans for the fall 2020 semester.   Kumar Decl. ¶ 11.   For example, the Carey Business School has determined that, so long as it is permissible to do so, students taking in-person courses in the fall will spend part of their time in the classroom with small groups of students and part of their time participating with their classes remotely, with discussion groups and projects conducted online depending on the specifics of the course.   *Id.*   By contrast, the Bloomberg School of Public Health has contemplated, though not formally adopted, a plan in which there would be no face-to-face course work for the first and second terms of the 2020–21 academic

year.   Compl. ¶ 60; Declaration of Ellen MacKenzie ¶ 5.   Put simply, Johns Hopkins believes it should be employing a nuanced, fluid approach that accounts for changing conditions on the ground and balances pursuit of its academic mission with the health and safety of the Johns Hopkins community.   Kumar Decl. ¶ 10; Gange Decl. ¶ 10 (July 12, 2020).   This would translate to different approaches, for different programs, at different stages of the semester.

### C.      The July 6 Directive

On July 6, 2020, without employing notice-and-comment rulemaking or otherwise warning that it would be revising its policy, ICE issued the July 6 Directive.   *See* Shaffer Decl., Ex. 1.   Under the Directive, "[n]onimmigrant F-1 . . . students attending schools operating entirely online may ***not*** take a full online course load and remain in the United States."   *Id.* Instead, "[a]ctive students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status.   If not, *they may face immigration consequences including, but not limited to, the initiation of removal proceedings*."   *Id.* (emphasis added).

As to the universities, the July 6 Directive required that they (1) decide, by July 15, *within nine days*, whether any academic program will proceed only by remote means and, if so, disclose those programs to ICE; (2) update, by August 1, the operational plans on file with ICE for each academic program and determine whether the program will consist of solely in-person classes, delayed or shortened sessions, or a hybrid of in-person and remote classes; (3) update, on an ongoing basis, the operational plans on file with ICE, within 10 days of any change in the program's "operational posture"; and (4) update and reissue, by August 4, the I-20 forms for *every single* student who holds an F-1 visa.   *Id.*

The July 6 Directive was a shock.   *See, e.g.*, Kumar Decl. ¶ 15.   Coming in the midst of the worst period of COVID-19 infection on record, *see* Compl. ¶ 78, the July 6 Directive

appears to rely on the unstated (and flatly inaccurate) premise that conditions in the United States have improved since the March 13 Guidance so as to justify rolling it back.   For example, the July 6 Directive describes the rule laid out in the March 13 Guidance merely as allowances made "during the height of the [COVID-19] crisis."   Shaffer Decl., Ex. 1.   But March was not the "height of the" pandemic—far from it.   Nationwide, from March 15 to March 20, the number of reported cases of COVID-19 increased by fewer than 5,000.   *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://tinyurl.com/t9j9fdw (last visited July 13, 2020); *see also* Coronavirus Resource Center, Johns Hopkins University & Medicine, https://coronavirus.jhu.edu/map.html (last visited July 13, 2020).   On July 6 alone, however, the reported increase in cases was 47,300, and on July 10, the date of the Complaint, the number of reported cases increased by 68,241.   *Id.*   By any measure, the COVID-19 pandemic in the United States is raging.

Consistent with these figures, on July 8, the CDC stated the obvious truth:   that the risk from COVID-19 increases with the level of in-person activity.   Shaffer Decl., Ex. 3. Identifying full-sized, in-person classes at institutions of higher learning as the "Highest Risk," the CDC noted that:

> IHEs [institutions of higher education] vary considerably in geographic location, size, and structure.   As such, ***IHE officials can determine***, in collaboration with state and local health officials, ***whether and how to implement these considerations while adjusting to meet the unique needs and circumstances of the IHE and local community***.   Implementation should be guided by what is ***feasible, practical, acceptable, and tailored to the needs of each community***.

*Id.* at 6 (emphasis added).

Meanwhile, the nation remains under the President's declaration of a state of emergency. Compl. ¶ 111.   That emergency is what drove the issuance of the March 13 Guidance and what

would, under its terms, remain ICE's lodestar for any future guidance such that, once the emergency ended, only then might the March 13 Guidance end too.   Shaffer Decl., Ex. 2 (provisions will remain "in effect for the duration of the emergency").   Notably, however, the July 6 Directive does not purport to rescind, reconsider, or otherwise amend the March 13 announcement.   It simply proceeds on the apparent, yet unstated, premise that the national emergency that prompted the March 13 Guidance has passed.   Such reasoning (if it can be called that) is fanciful as well as dangerous.

Other evidence suggests the real motivation for the Directive is the Administration's desire to force schools and universities to reopen, whatever the consequences.   On July 6, the day ICE issued the Directive, the President insisted on social media that schools needed to reopen.[3]   The next day, he reiterated his insistence at a White House event, promising to pressure institutions to reopen.[4]   Similarly, the Acting Deputy Secretary of Homeland Security explained on July 7, 2020 that the Directive issued the day before will "encourage schools to re-open."   John Bowden, *Cuccinelli says rule forcing international students to return home will 'encourage schools to re-open'*, The Hill (July 7, 2020), https://tinyurl.com/yadcusmt.

As transparent as the motivation for ICE's action may be, the terms of the Directive remain opaque.   For example, the Directive requires Johns Hopkins to certify that international students are not taking an "entirely online course load," without illuminating what qualifies as in-person instruction sufficient to make a student's course load not "entirely online."   *See* Shaffer Decl., Ex. 1.   Further, certain programs involve in-person components in labs

---

[3]   "SCHOOLS MUST OPEN IN THE FALL!!!"   Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM), https://tinyurl.com/y7v2ldgm.

[4]   The President said, "[W]e're very much going to put pressure on governors and everybody else to open the schools, to get them open. . . . [W]e're going to be putting a lot of pressure on: Open your schools in the fall."   *See* Peter Baker & Erica L. Green, *Trump Leans on Schools to Reopen as Virus Continues Its Spread*, N.Y. Times (July 7, 2020), https://tinyurl.com/y9pwq9ha.

accompanied by instruction that will proceed online.   Kumar Decl. ¶ 17.   The university has committed to making every effort to ensure these labs proceed in person if conditions permit, but the July 6 Directive does not specify whether such labs would qualify for the hybrid modality, notwithstanding that "the core educational component of the course" may well be the lab.   *Id.*

### D.      The Impact Of ICE's Change In Policy

What is clear, however, is that the July 6 Directive has plunged Johns Hopkins and the rest of the nation's universities into disarray.   The Directive forces Johns Hopkins to choose between, on the one hand, preserving the visa eligibility of its international students, and on the other hand, continuing to make real-time, data- and public health-driven decisions about the safest way to provide instruction and promote the academic mission of the university.   Under the Directive, international students whose course work is, or at any time becomes, "entirely online" would now lose their F-1 visa status and be required to "depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status[, and i]f not, they may face immigration consequences including, but not limited to, the initiation of removal proceedings."   Shaffer Decl., Ex. 1.   So if, as occurred during the spring semester, Johns Hopkins (or local, state, or federal authorities) determines that conditions on the ground require suspending in-person courses, and the university converts all courses to remote-learning alternatives, all Johns Hopkins students with F-1 visas will lose their visas and be required to leave the country.   The Directive thus forces Johns Hopkins to choose between "forsak[ing] its institutional duty and academic imperatives by taking steps that would diminish the participation of international students in [its] academic programs" and "abdicat[ing its] responsibility to act in the best interest of the safety and well-being of [its] community."   Kumar Decl. ¶ 25.

For Johns Hopkins, losing its international students from campus would be calamitous. Kumar Decl. ¶ 19.   The university depends on the presence and diversity of its international

students.   *Id.*   The curricula at the university's various schools draw frequently on the perspectives of international students, and the absence of such expertise and perspective would greatly diminish the education for the university and all its students.   *Id.*   Forcing all Johns Hopkins' students with F-1 visas to desert its campuses would deprive the university of their innovative research contributions, stunt the development of scholarship, and undermine Johns Hopkins' mission of bringing the benefits of discovery to the world.   *Id.*; Compl. ¶ 84.   "It would so alter the nature of Johns Hopkins and most of [its] academic programs as to render them virtually unrecognizable."   Kumar Decl. ¶ 19.

Beyond the fundamental encroachment on its academic freedom, the July 6 Directive poses additional immediate harms to Johns Hopkins.   It is impracticable for the university to comply with the July 15 deadline for informing ICE whether any programs will proceed only through remote instruction and to even know what that means in concrete application.   Kumar Decl. ¶ 17.   A number of academic divisions have not yet determined whether they will offer in-person instruction in addition to remote programs.   *Id.*; MacKenzie Decl. ¶ 15.   That decision depends not only on COVID-19 trends, but on the unique pedagogical requirements of each program.   Moreover, all divisions and programs have explicitly reserved the right and ability to move all courses fully online at any point during the semester depending on how the circumstances develop on the ground.   Kumar Decl. ¶ 17.   Balancing the interests at play is agonizingly difficult, and for many Johns Hopkins programs, it simply is not possible to complete that process and make a decision by July 15.   *Id.*   Johns Hopkins cannot in good conscience, and consistent with the utmost seriousness required of submissions to the government, commit definitively to one or another instructional modality across all of its programs on the nine-day deadline abruptly imposed by the July 6 Directive.   *Id.*

The August 1 and 4 deadlines are similarly problematic.   The former requires the same programmatic determinations and legal interpretations that the July 15 deadline does.   *See supra* 9, 13.   The latter requires Johns Hopkins to update and reissue the I-20 forms for *every single* student who holds an F-1 visa.   That is a time-consuming process.   Kumar Decl. ¶ 16; Gange Decl. ¶ 20(e); Compl. ¶¶ 73–74.   It requires gathering information from the student, including detailed financial information, as well as from university databases.   Kumar Decl. ¶ 16; Gange Decl. ¶ 20(e); Compl. ¶¶ 73–74.   It can take an experienced administrator familiar with the process up to 30 minutes to update and reissue a Form I-20.   Gange Decl. ¶ 20(e).   With approximately 5,000 students studying at Johns Hopkins on F-1 visas, that translates to approximately 2,500 hours of work.   *Id.*   Johns Hopkins' Office of International Services lacks the resources to complete this work consistent with its other obligations in the time allotted by the July 6 Directive.   *Id.* ¶¶ 20(e)–(f); Kumar Decl. ¶ 16; Compl. ¶ 125.   And even if the university were staffed and equipped to gather and update students' information in the forms, the July 6 Directive's terms are so confusing and unclear to administrators and students that they cannot plan for class registration; without knowing a student's course load, however, the university cannot possibly certify that "the student is not taking an entirely online course load," as the Directive requires.   Kumar Decl. ¶ 16; Compl. ¶¶ 73–74.   Notably, I-20 forms must be separately signed by both the university and student, under penalty of perjury, in order to certify compliance, which is subject to auditing and severe sanctions for noncompliance.   Kumar Decl. ¶ 16; Compl. ¶¶ 73–74.

The problems the Directive poses for the university and its international students are insoluble and devastating.   Until now, Johns Hopkins' international students have been leading the charge on innovative, life-saving research (including COVID-19 research) that would come

to an abrupt halt if they were precluded from starting the fall 2020 semester or abruptly forced to leave campus midway through because conditions require suspension of in-person coursework. Kumar Decl. ¶ 20.   Losing their visa status would also deprive these students of associated work permits (known as "Optional Practical Training" or "OPT") that allow them to obtain employment in the United States for a period of time after they obtain their degrees.   *Id.*   Still other students would face deplorable conditions in their home countries, whether from COVID-19, civil war, unreliable (or no) internet connections, repressive regimes that do not permit studying sensitive academic materials, or other factors.   *Id.*   Sudden expulsion from the United States would also visit a range of injuries on international students, including but not limited to the price of last-minute transoceanic flights; lost security deposits and broken lease fees; ongoing student loan obligations for educations they cannot access; the disruption of their families' lives here; and risks of contracting COVID-19 while traveling amidst a raging pandemic.   *Id.*; Compl

These harms to students flow to Johns Hopkins too.   Many international students will opt for an alternative to Johns Hopkins if forced to choose between obtaining a Johns Hopkins degree via remote instruction from abroad, or instead enrolling in a program that permits them to live in the United States, a program in another country, or no program at all.   Kumar Decl., ¶ 21. For many programs, particularly advanced-degree programs that attract a substantial proportion of international students, in-class instruction may be far less important to the academic experience than the research, laboratory work, internships, and networking that occur on and around campus.   *Id.*   Separately, in some countries—for example, China and India—degrees from international institutions earned via remote instruction may not be recognized, causing students to lose the value of their credits already earned.   In addition, some graduates may be ineligible for some categories of jobs in those countries.   *Id.*   The upshot is that Johns Hopkins

will lose students, thereby not only reducing tuition payments to the university but also requiring additional cash outlays for teaching assistants, residential advisors, laboratory assistants, and similar positions that these students fill.   *Id.*   The Carey Business School, for example, has a large international student body and faces serious financial stress from the forced withdrawals and deferred enrollments that now loom.   *Id.*   Similarly, the university stands to lose money it has paid to secure hotel rooms (subsidized by university funds and under long-term leases) that would be wasted if students with F-1 visas are forced to leave campus.   *Id.*

## LEGAL STANDARDS

A movant seeking either a temporary restraining order or a preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.   *Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015); *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 41 (D.D.C. 2018) (same standard for temporary restraining order and a preliminary injunction).   Under Federal Rule of Civil Procedure 65, the Court may issue a temporary restraining order for up to 14 days without notice to the adverse party and may issue a preliminary injunction on notice to the adverse party.   A plaintiff must show it faces irreparable injury before a temporary restraining order or preliminary injunction issues.   *See Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 202 (D.D.C. 2015).

Case law is divided on whether a plaintiff must show *both* a likelihood of success *and* irreparable harm in order for a temporary injunction to issue, or whether a strong showing on one factor can compensate for a weaker showing on another (the "sliding scale" approach).   *See, e.g.*, *Soundboard Ass'n v. FTC*, 254 F. Supp. 3d 7, 9–10 (D.D.C. 2017) ("Some judges of the D.C. Circuit have expressed the view that . . . a movant cannot obtain an injunction without showing both a likelihood of success and a likelihood of irreparable harm.").   The D.C. Circuit

"has expressly declined to address the viability of the 'sliding scale' approach." *United States v. Bolton*, No. 20 Civ. 1580 (RCL), 2020 WL 3401940, at *3 (D.D.C. June 20, 2020).

But any question about the precise framework should not matter here. The factors together provide powerful warrant and each one favors the requested relief. The July 6 Directive is likely to fail judicial review on the merits. The irreparable harm faced by Johns Hopkins is both imminent and irremediable. Ultimate vindication will provide no succor—for the university and countless innocent students and faculty whose lives and educational missions will be put at risk—unless a temporary injunction issues now. And the balance of equities and public interest overwhelmingly support the requested injunctive relief.

## ARGUMENT

## I.     JOHNS HOPKINS IS LIKELY TO PREVAIL ON THE MERITS

Johns Hopkins is likely to prevail on at least one of five claims:   (1) the July 6 Directive is arbitrary and capricious under the Administrative Procedure Act ("APA"); (2) it is contrary to law under the APA; (3) it violates the procedural requirements of the APA; (4) it violates the Due Process Clause of the Fifth Amendment; and (5) it imposes unconstitutional conditions that especially offend the First Amendment and the academic freedom protected thereunder.

### A.     The July 6 Directive Is Arbitrary And Capricious

The government's inexplicable decision to herd students back into classrooms *en masse*, lest they face expulsion from the country, is incapable of withstanding this Court's review under the APA's arbitrary-and-capricious standard. "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). That requires, at a minimum, "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* Where an agency fails to consider an "important aspect

of the problem," that "omission alone renders [the agency's] decision arbitrary and capricious." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).   And the agency may not articulate the requisite rational connection after the fact.   Because a "reviewing court must judge the propriety of agency action solely by the grounds invoked by the agency, *post hoc* explanations that the agency did not articulate when it acted are insufficient."   *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 237 (D.D.C. 2018).

Agency action that, as here, alters existing policy must overcome additional hurdles. The agency must "address past practice and formal policies regarding" the issue and "supply a reasoned analysis" for the change.   *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 647 (D.C. Cir. 2020).   Merely acknowledging the change in course is insufficient.   *Id.*   The agency must address the reliance interests its prior policy created and provide "a reasoned explanation" "for disregarding facts and circumstances that underlay or were engendered by the prior policy."   *Encino Motorcars*, 136 S. Ct. at 2125–26.   "An agency cannot ignore its prior factual findings that contradict its new policy nor ignore reliance interests."   *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019).   An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."   *Encino Motorcars*, 136 S. Ct. at 2126.

1.    ***The government failed to articulate any rationale (let alone a plausible one) for the July 6 Directive***

The July 6 Directive provides no comprehensible basis for ICE's action.   That alone should doom it.   *Encino Motorcars*, 136 S. Ct. at 2126 ("unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice"); *Nat'l Lifeline Ass'n*, 921 F.3d at 1111 ("An agency cannot ignore its prior factual findings that contradict its new policy nor ignore reliance interests.").   Here is the extent

of ICE's purported justification:   "as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations."   Shaffer Decl., Ex. 1.   That statement ignores the reality that the COVID-19 pandemic not only persists, but is worsening.

On its face, the statement that "many institutions across the country [are] reopen[ing]" is utterly vapid.   The Directive provides no indication as to what it means by "institutions," how "many" are reopening, or what it means to "reopen."   Even assuming "institutions" refers to *educational* institutions, the Directive is silent about what it means by "many" or how it arrived at a tally.   Nor does the Directive illuminate what it means to "reopen"—and whether providing solely in-person instruction counts.   For example, it is unclear under this standard whether Johns Hopkins is "reopening" or not.   To begin with, Johns Hopkins never closed—rather, it, like many universities, moved to fully online learning.   The Directive appears to rely on a false dichotomy between "open" and "closed," when the reality is that it exists along a spectrum.

Because ICE's stated premise is too cryptic to afford reasoned basis for anything, it cannot support ICE's anomalous conclusion that "there is a concordant need to" change its policy regarding the SEVP.   Where the proffered basis for agency action is indecipherable, it cannot withstand review under the APA.   *Encino Motorcars*, 136 S. Ct. at 2125.

If anything, the Directive depends upon a self-fulfilling prophecy.   As described above at 11, the thrust of the July 6 Directive is to force institutions to "reopen," whatever that may mean.   But an agency cannot justify regulatory action by citing circumstances of its own invention.   *Cf. Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004) (agency impermissibly relied on circular reasoning when it "assume[d] away the exact effect that the agency attempted to use [] to justify" regulatory action).

Finally, to the extent the instant decision rests on a judgment about the threat to public health that the COVID-19 pandemic currently poses, the APA required that ICE analyze the data and articulate a basis for its judgment.   Here, ICE has not even purported to account for the status of the COVID-19 emergency that animated the March Guidance.   Nor can ICE rationally deny that the COVID-19 emergency persists, as data incontestably demonstrate and the United States Government elsewhere acknowledges.   *See supra* 10–11; *see infra* 25–26.   At its core, therefore, the Directive is the quintessence of arbitrary and capricious agency action.   *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (failure to consider an "important aspect of the problem" renders agency's "decision arbitrary and capricious").

Lest there be any doubt, ICE's unreasoned approach is irreconcilable with the CDC's evidence-based guidance of only two days later.   On July 8, the CDC explained that:

> IHEs [institutions of higher education] vary considerably in geographic location, size, and structure.   As such, ***IHE officials can determine***, in collaboration with state and local health officials, ***whether and how to implement these considerations while adjusting to meet the unique needs and circumstances of the IHE and local community***.   Implementation should be guided by what is ***feasible, practical, acceptable, and tailored to the needs of each community.***

Shaffer Decl., Ex. 3, at 6 (emphasis added).   In other words, the CDC is commending precisely the sort of flexible approach, "tailored to the needs of each community," that Johns Hopkins has been successfully employing but that ICE has inexplicably foreclosed.

At the end of the day, the only way to understand the Directive is as an outgrowth of the Administration's desire to dictate to the nation's schools and universities how to conduct their affairs.   Notably, the Administration has acknowledged that ICE's decision is designed to force universities to conduct in-person classes notwithstanding the considered judgments of university and public health officials that it may not be safe or educationally advisable to do so in certain

circumstances.   As discussed above, the same day ICE issued the Directive, the President insisted on social media, and reiterated the next day at a White House event, that schools must open.   *See supra* 11.   And the Acting Deputy Secretary of Homeland Security explained on July 7, 2020 that ICE's Directive will "encourage schools to re-open."   *See id.*

Viewing "the evidence as a whole," there is "a significant mismatch between the decision [ICE] made and the rationale [it] provided."   *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).   Because it is impossible to understand ICE's decision "in terms of" its stated rationale, it is invalid under the APA.   *Id.*   Even worse, however, there are strong indications that ICE's Directive is being used as a device to trample on academic freedoms and prerogatives that are constitutionally protected by the First Amendment.   *See infra* 35–37.   In this light, the doctrine of constitutional avoidance provides all the more reason why the instant challenge is likely to succeed under the APA.   *See, e.g.*, *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979) (courts should construe legislation so as to avoid having "to resolve difficult and sensitive [constitutional] questions").

## 2.    *The July 6 Directive fails to consider important aspects of the problem*

Johns Hopkins is also likely to succeed on its claim that the July 6 Directive is arbitrary and capricious because the Directive "entirely fail[s] to consider . . . important aspect[s] of the problem."   *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913.

*First*, the Directive gives no consideration to the havoc it will wreak on F-1 visa holders and educational institutions that are doing their level best to comply but, due to circumstances beyond their control, may be forced to switch from partially in-person to entirely remote courses during the coming semester.   Johns Hopkins planned its fall semester with the benefit of extensive collaboration with the world's leading doctors and epidemiologists, including those in the university's Health Advisory Group, the entity charged with advising the university's senior

leadership on COVID-19 issues and ways to continue safely pursuing Johns Hopkins' academic mission.   Gange Decl. ¶¶ 7–8; Compl. ¶¶ 55–59.   The resulting plan would enable certain programs to instruct students remotely in order to de-densify the campuses and minimize risk of spreading COVID-19, while others follow a hybrid model and all retain the flexibility to toggle between modalities as appropriate under the circumstances.   Gange Decl. ¶ 9; Compl. ¶¶ 60–63.

The Directive frustrates all of this careful planning to no good end.   If Johns Hopkins determines on October 15 that in-person classes are too risky to continue, its international students will lose their visas and be required to leave the country within a matter of days. Shaffer Decl., Ex. 1.   Once this happens, those students cannot simply return to campus if the university resumes in-person instruction, say, a month later.   When a student loses her F-1 visa, she must undertake anew an application process that is time-consuming under the best of circumstances (never mind those prevailing today).   *See*, *e.g.*, Department of Homeland Security, SEVIS Help Hub: Terminate a Student, https://tinyurl.com/y8ujrdon ("When an F-1/M-1 SEVIS record is terminated, . . . Student loses all on- and/or off-campus employment authorization. . . .   Student cannot re-enter the United States on the terminated SEVIS record. . . .") (last visited July 13, 2020); U.S. Immigration & Customs Enforcement, *Student and Exchange Visitor Program: Travel*, https://www.ice.gov/sevis/travel (students must leave the United States to renew an F-1 visa) (last visited July 13, 2020).   Beyond that, sudden loss of visa status will uproot lives, undermine ongoing research trials (including research into COVID-19 and clinical trials), necessitate travel expenses, and tear apart campus communities.   *See* Kumar Decl. ¶ 20; Compl. ¶ 82.   Nothing in the July 6 Directive reflects any consideration of these appalling, unfair consequences.

*Second*, the Directive reflects no consideration of whether it is possible for programs to

decide by July 15 if they will proceed only with remote-learning options.   That decision hinges not only on COVID-19 trends, but on the unique pedagogical requirements of each program. Kumar Decl. ¶ 17.   The already "agonizingly difficult" decision these university officials faced about their programming has been made "extraordinarily complex and extremely vexing."   *Id.* ¶¶ 17, 22.   Certain academic divisions of Johns Hopkins cannot yet know one way or the other whether their curricula will involve only remote learning.   Kumar Decl. ¶¶ 14, 22.   The July 6 Directive takes no account of these problems, however, in setting the July 15 deadline for universities to make pivotal, vexing, binding decisions about their operational plans.

*Third*, the July 6 Directive takes no account of the crushing administrative burden it imposes.   The Directive requires all universities, by August 4, 2020, to update and reissue the I-20 forms for all students who hold F-1 visas—which, just in the case of Johns Hopkins, is approximately 5,000.   Kumar Decl. ¶ 16; Gange Decl. ¶ 16.   That process takes time.   It requires gathering information from each student, including detailed financial information, as well as from university databases.   Kumar Decl. ¶ 16; Compl. ¶ 125.   Johns Hopkins, for instance, simply does not have the resources necessary to complete this work consistent with its other obligations in the time allotted under the July 6 Directive.   Kumar Decl. ¶ 16; Gange Decl. ¶ 20(e)–(f).

ICE is required to "pay[] attention to the advantages and the disadvantages of [its] decisions."   *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).   Its complete failure to do so here constitutes another reason why the July 6 Directive is unlawful.

### 3.   *The July 6 Directive fails to consider Johns Hopkins' and its students' reliance on ICE's prior guidance*

Defendants also failed to consider the reliance interests of universities.   ICE is not permitted to "ignore its prior factual findings that contradict its new policy nor ignore reliance

interests." *Nat'l Lifeline Association*, 921 F.3d at 1111.   In this case, the "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."   *Encino Motorcars*, 136 S. Ct. at 2126.

As explained above at 7–9, Johns Hopkins alongside its fellow universities undertook a painstaking deliberative process to determine how its fall 2020 semester should proceed.   *See also* Gange Decl. ¶¶ 7–8; Kumar Decl. ¶ 8, 9; Compl. ¶¶ 55–59.   "In formulating, adopting, and implementing plans for the fall 2020 semester, Johns Hopkins relied on ICE's assurance that the March 13 Guidance would continue so long as the COVID-19 crisis remained in effect." Kumar Decl. ¶ 14.   And because the university understood that international students would be permitted to retain their visas and stay in the United States if the university had to suspend all in-person instruction, as in the spring semester, dozens of university officials spent months devising standards and protocols for delivering flexible, tailored academic instruction amidst a global crisis unlike any in recent history.   Gange Decl. ¶¶5, 10; Kumar Decl. ¶ 8.   The July 6 Directive pulled the rug out from under these carefully laid plans without so much as acknowledging "serious reliance interests," *Encino Motorcars*, 136 S. Ct. at 2126, let alone identifying countervailing factors sufficient to outweigh them.

The Supreme Court's recent decision holding that the Administration violated the APA in its effort to end the Deferred Action for Childhood Arrivals program, or DACA, provides a useful comparison.   In that case, the Court held that Defendant DHS's rescission of DACA was arbitrary and capricious because (among other things), the agency failed to "assess whether there were reliance interests" on DACA, "determine whether they were significant, and weigh any such interests against competing policy concerns."   *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913–1915.   DHS has made the same mistake here:   the July 6 Directive fails to address in any

way how universities and their students have relied on the March 13 Guidance, much less attempt to balance it against competing interests. "Making that difficult decision was the agency's job, but the agency failed to do it." *Id.* at 1914. Just as Defendants' interference with immigrant children violated the APA, so too does its interference with international students and the universities they enrich.

**B.      The July 6 Directive Is "Otherwise Not In Accordance With Law"**

Not only is the July 6 Directive contrary to reason, it is contrary to law. Because the July 6 Directive "does not comport with governing statutes or regulations," it is "not in accordance with law" and should "be set aside." *J.E.C.M. by & Through His Next Friend Saravia v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va. 2018). Specifically, the July 6 Directive contradicts both an Executive declaration and an agency determination.

On March 13, the President found and proclaimed "that the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020." *See supra* 5. The same day, ICE issued the March 13 Guidance, stating it would remain in effect for the "duration of the emergency" that the President had just declared. Shaffer Decl., Ex. 2. Months earlier, the Secretary of Health and Human Services determined that, "as a result of confirmed cases of 2019 Novel Coronavirus . . . a public health emergency exists and has existed since January 27, 2020, nationwide." Dep't Health and Human Servs., *Determination That a Public Health Emergency Exists* (Jan. 31, 2020), https://tinyurl.com/smjl72r.

Even as members of the Administration suggest that the COVID-19 emergency has lessened or passed altogether, the legal declaration of the state of national emergency remains in full force and effect. Nor could it be otherwise in light of reality of the status of the pandemic in the United States. On March 13, there were 556 new reported cases in the United States; on July 10, when Johns Hopkins commenced this action, there were 68,241. In other words, the

number of reported cases that arose *throughout the entire day* that the President declared that we are in a state of emergency now arise *every 12 minutes*.

With the July 6 Directive, however, ICE has done exactly what it indicated in the March 13 Guidance it would not do:  it reversed the provisions of that Guidance even while the country remains gripped by precisely the same (or worse) emergency, as acknowledged elsewhere by the Executive Branch.   Nor does it purport to rescind, reconsider, or otherwise amend the March 13 Guidance.   The July 6 Directive simply proceeds on the topsy-turvy premise that the national emergency that prompted the March 13 Guidance has passed.    That is contrary to law (and fact), and it violates the APA.

### C.    The Government Violated The APA By Failing To Provide Notice Or A Meaningful Opportunity For Comment On The July 6 Directive

The July 6 Directive is just as deficient procedurally as it is substantively.   The APA requires a federal agency to provide adequate notice of any regulation it proposes adopting. 5 U.S.C. § 553.   This notice "must include sufficient detail on [the regulation's] content and basis in law and evidence to allow for meaningful and informed comment."   *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995).    The point of the notice is to enable "an *exchange* of views, information, and criticism between interested persons and the agency," which can happen only if the agency "disclose[s] in detail the thinking that has animated the form of a proposed rule."   *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977) (emphasis added). Among the information an agency must divulge are the *facts* on which its action is premised. *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008).   "By requiring the 'most critical factual material' used by the agency be subjected to informed comment, the APA provides a procedural device to ensure that agency regulations are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to

support their positions, and thereby to enhance the quality of judicial review." *Chamber of Comm. of the United States v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006).

These notice requirements are essential to ensuring the accuracy and fairness of agency action. Absent sufficient identification of factual premises, interested parties cannot correct misperceptions that would lead the agency astray. *See, e.g.*, *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982) (if notice "fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals. As a result, the agency may operate with a one-sided or mistaken picture of the issues at stake in a rule-making").

ICE's failure to provide *any* notice or opportunity to comment is improper. The July 6 Directive came from out of the blue, on the first business day after Independence Day, as university officials were finalizing their plans for the fall semester, weeks before waves of students would arrive on campus, and with only nine days before the first deadline for compliance. There is no plausible emergent circumstance requiring that ICE reverse itself so precipitously or demand compliance so quickly. Nor is there any emergent circumstance justifying recertification of thousands of I-20 forms or any other provision of the Directive. If anything, the operative premise of the July 6 Directive is that there is *no* emergency. There is no discernible reason—and certainly none expressed in the July 6 Directive—why ICE could not have provided at least a modicum of notice and comment before instituting the Directive.

ICE will presumably attempt to justify its actions by seeking to cloak the July 6 Directive under the guise of a "Temporary Final Rule," *see* Shaffer Decl., Ex. 1, or as interpretive guidance, general statements of policy, or other action exempt from notice-and-comment requirements. But the Directive is a "rule" in every relevant sense under the APA. It is an

"agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."   5 U.S.C. § 551(4).   It imposes on Johns Hopkins and students holding F-1 visas the obligation to comply with its dictates—on accelerated, arbitrary timelines—or else face severe, immediate consequences for noncompliance.   An interpretive rule cannot "confer benefits or ensure the performance of duties" where the basis is not existing law or agency action.   *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).   However it may be styled, the July 6 Directive is a rule—the violation of which will trigger expulsions *en masse*.

Nor does ICE have good cause for providing no notice, inviting no comment, and affording no process whatsoever.   This is not an instance where notice and comment would have been "impracticable, unnecessary, or contrary to the public interest," as the APA requires before exempting an agency from its prescribed process.   *See* 5 U.S.C. § 553(b)(B).   In rare cases where good cause may exist, it should be "narrowly construed and only reluctantly countenanced" and "must be supported by more than the bare need to have regulations." *United States v. Cotton*, 760 F. Supp. 2d 116, 127–28 (D.D.C. 2011).   Certainly the COVID-19 pandemic affords ICE no excuse.   To the extent that the COVID-19 emergency persists, as the data indicate it most certainly does, ICE had no reason to depart from the March 13 Guidance, much less to do so in haste.   To the extent ICE misperceives the pandemic as abating, that is the opposite of an emergency.   In neither event does ICE have good cause for reversing itself without notice and comment.   Indeed, assuming *arguendo* that ICE would assert good cause, its claimed good cause would not possibly extend so far as to justify dispensing even with the sort of abbreviated process that has, in rare cases, been judicially approved where genuine exigency presents itself.   *Cf. Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 629–31 (D.C. Cir. 1996) (approving

FCC's 7-day notice-and-comment period as comporting with the "urgent necessity for rapid administrative action under the circumstances").

### D. Both The July 6 Directive And The Process That Produced It, Violate The Due Process Clause

If Johns Hopkins' likelihood of success were not clear enough under the APA, the constitutional concerns should dispel any doubt about whether the university is likely to succeed on the merits.   The extraordinary unfairness and precipitousness of ICE's reversal, combined with the way it imperils lives and educations, offend the Due Process Clause in distinct but related respects:   The July 6 Guidance puts regulated entities in an impossible position without affording them prior notice or opportunity to be heard, and without them affording intelligible guidance on how they are meant to comply.

#### 1. *The government failed to provide notice and an opportunity to be heard*

Due process requires effective notice and a meaningful opportunity to be heard, but ICE has afforded neither.   The Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."   U.S. Const. amend. V.   Consistent with due process, a person facing a deprivation of property is entitled to notice of the reasons for the adverse action and an "opportunity to be heard at a meaningful time and in a meaningful manner."   *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).   As to timing, the Fifth Amendment requires (absent extraordinary circumstances) that "an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."   *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis added).   Underlying these procedural requirements is a foundational premise:   "[W]hen a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented."   *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).

Had Johns Hopkins received the notice and opportunity to be heard that due process requires—or any semblance of the notice-and-comment process prescribed by the APA—it could have had *some* chance to engage ICE, raise its concerns, and correct ICE's misconceptions.   That Johns Hopkins and other universities were afforded no such opportunity, none, poses a serious constitutional problem on these facts.

Courts apply a "familiar two-part inquiry" to determine whether the strictures of the Due Process Clause have been satisfied:   (1) whether the plaintiff faces a deprivation of a protected property or liberty interest, and, if so, (2) whether that plaintiff has received the process that is due.   *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).   Here, it should be clear that Johns Hopkins faces a deprivation of rights and property.   "To have a property interest in a benefit, a person . . . must . . . have a legitimate claim of entitlement to it."   *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).   So "long as a property deprivation is not de minimis, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause."   *Goss v. Lopez*, 419 U.S. 565, 576 (1975).   For example, courts have recognized deprivation of property interests in junk cars and in amounts as low as $100 dollars sufficiently weighty to warrant due process.   *Propert v. District of Columbia*, 948 F.2d 1327, 1333 (D.C. Cir. 1991) (hearing before an "unbiased decision-maker" was required before city could tow and destroy "junk" vehicle); *Gray Panthers v. Schweiker*, 652 F.2d 146, 158, 179 (D.C. Cir. 1980) (hearing was required before government could deny Medicare claims valued at less than $100).

The July 6 Directive deprives Johns Hopkins and its students of constitutionally protected interests.   *First*, it deprives them of the benefit of the university's intensive, months-long, data-, and public health-informed effort to craft a sensible and safe plan for providing education to its

students and would force the university to change course based not on its own assessment of how best to fulfill its academic mission safely but on an arbitrary directive. *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) ("[a]cademic freedom" has "long has been viewed as a special concern of the First Amendment"); *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (similar); *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (recognizing the "four essential freedoms of a university" include its right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study"); *see also Butera v. District of Columbia,* 235 F.3d 637, 650–51 (D.C. Cir. 2001) (where state "affirmatively act[s] to increase or create the danger that ultimately results in the individual's harm," that may violate due process). *Second*, the July 6 Directive deprives the university of tuition payments from international students who may have no basis or means to participate because doing so from outside the United States has become impractical, impossible, or not equivalent to the educational program to which they applied. *See Continental Training Svcs., Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir. 1990) (educational institution "had both a liberty and a property interest at stake" in its eligibility for student loan payments under the Higher Education Act and therefore was entitled to due process before eligibility was revoked). *Third*, it deprives Johns Hopkins of resources it will be required to expend to recertify approximately 5,000 students' I-20 forms in compliance with the July 6 Directive. *See Tri Cnty. Indus., Inc. v. District of Columbia,* 104 F.3d 455, 461 (D.C. Cir. 1997) (suspension of building permit violated due process where "interruption of construction [was] likely to be very costly"). *Fourth*, it deprives the university of housing accommodations and educational opportunities that international students would now be precluded from availing themselves of and paying for. *See Propert*, 948 F.2d at 1333; *Gray Panthers*, 652 F.2d at 158.

And *fifth*, it creates the possibility that the university will lose programs that depend on international students as their life blood.   *See generally Bakke*, 438 U.S. at 312–14; *Keyishian*, 385 U.S. at 603; *Sweezy*, 354 U.S. at 262–63.

Because Johns Hopkins was deprived of its rights and property, it was entitled to due process.   In contrast, ICE afforded no process and accepted no input before it abruptly changed policy at the direct and grievous expense of Johns Hopkins and its students.   *Mathews v. Eldridge*, 424 U.S. 319 (1976), demands more.   *Mathews* identifies three factors that a court must evaluate when deciding what process is due for a particular deprivation:   (1) "the private interest that will be affected;" (2) "the risk of an erroneous deprivation;" and (3) the "Government[] interest[s]" at issue.   424 U.S. at 335.   Balancing these factors, Johns Hopkins and other institutions of higher education throughout the nation were entitled to more process than they were afforded here.

There are substantial private interests at issue here, including Johns Hopkins' constitutionally protected right of academic freedom and its substantial investment of time, money, and resources in planning its curriculum while keeping its community safe.   Similarly, the risk of erroneous deprivation is high given that the government has not proffered *any* rationale for the July 6 Directive, nor provided an opportunity to contest it.   *See, e.g.*, *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 102 (D.D.C. 2012) (District of Columbia's vehicle forfeiture scheme created likely risk of erroneous deprivation where "owners [were] given no opportunity to test the probable validity" of impoundment "after the seizure and pending forfeiture proceedings").

The only discernible rationale has come from the President, and it is merely his desire to force action by the country's educational institutions.   *See, e.g.*, Donald J. Trump

(@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM), https://tinyurl.com/y7v2ldgm ("SCHOOLS MUST OPEN IN THE FALL!!!").   Left unsaid in the President's exhortation is why, how, and to what end.   The answer, of course, is obvious:   the Administration's Directive serves some unstated political objective, but one that cannot be said aloud without revealing the capricious underlying intent.   Finally, it is unclear, at best, what governmental interest existed in avoiding process altogether.   By no means did any emergent circumstance require that universities be directed to make important elections and submissions a mere nine days after the change was announced.   To the contrary, ICE would have *benefitted* from inviting comments on the July 6 Directive, which, at the very least, could have informed ICE about the vagaries of its Directive.

### 2.    *The July 6 Directive is void for vagueness*

As things stand, the July 6 Directive is hopelessly vague and leaves Johns Hopkins mystified as to how the university and its students are meant to comply, even as signed certifications of compliance, under penalty of perjury, will be coming imminently due.   The Due Process Clause requires that (1) regulated parties "should know what is required of them so they may act accordingly," and (2) regulations be precise enough to ensure "those enforcing the law do not act in an arbitrary or discriminatory way."   *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).   Where, as here, a rule threatens constitutionally protected rights, "a particularly stringent vagueness and fair-notice test" applies.   *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020).   And a regulation such as the July 6 Directive that results from an abrupt change in policy, enacted without opportunity for comment, is even more suspect.   *See Fox*, 567 U.S. at 254 (agency's abrupt shift in interpretation of law, without regulatory notice and process, illustrated the unconstitutional vagueness of the law).

The vagueness of the July 6 Directive leaves universities and students unsure of what

they must do to retain students' F-1 visa status.   The Directive requires that students attend schools with "in-person instruction" or risk immediate deportation, but it does not explain what "in-person instruction" means in this context.   Johns Hopkins needs to know whether programs that, for example, involve self-directed study, provide for student-teacher interaction, or require work in labs, will qualify as "in-person instruction."   *See, e.g.*, Declaration of Student B ¶ 12 (July 13, 2020) ("Although I have signed up for immersive, in-person laboratory work for the coming term, I do not know whether laboratory research on its own will fulfill the requirements under this new guidance.").   Similarly, the Directive requires Johns Hopkins to certify that its fall program "is not entirely online," but it fails to specify what that entails.   *See, e.g.*, MacKenzie Decl. ¶ 14 ("[T]he directive only mandates that F-1 students participate in coursework that is 'not entirely online,' but our School's leadership is not certain how many hours, or credits, of in-person instruction is necessary to fulfill the directive for our students, or to preserve our SEVP accreditation.").

These indeterminate standards illustrate the danger of vague regulations—danger that is compounded by the inability to comment and alert ICE to the practical questions that need to be answered, clearly and right up front, in order for universities to understand their obligations and plan while they cope with a fast-evolving pandemic that would challenge them under any circumstance.   While left bereft of key specifics and in the dark as to what ICE envisions, Johns Hopkins can only speculate about what is required for its thousands of international students to qualify for F-1 visas, while left at the mercy of ICE.   Depending on how it subsequently construes and applies its cryptic guidance, ICE may at its discretion reject Johns Hopkins' determinations and even potentially fault and sanction Johns Hopkins during an audit process for perceived noncompliance and purported false statements in the Form I-20 certification process,

including by removing Johns Hopkins from the SEVP.   Its students, meanwhile, could face significant penalties, including deportation and removal of visa eligibility for up to ten years under 8 U.S.C. § 1182(a)(9)—a sanction that could scar their reputations and careers for life. Especially under these circumstances, the failure to provide "notice of behavioral expectations" may itself render the July 6 Directive void for vagueness.   *Karem*, 960 F.3d at 665.

E.   **The July 6 Directive Usurps Academic Freedom And Imposes Unconstitutional Conditions**

Finally, it bears emphasizing that the July 6 Directive marks a significant—and, by all indications, calculated—intrusion on academic and pedagogical prerogatives and freedoms that the First Amendment specially protects.   Visa eligibility, to be sure, is not constitutionally guaranteed.   But neither can visa status be manipulated by the government to achieve unconstitutional ends.   In particular, the government may not withhold benefits as a consequence of a person's exercise of constitutional rights.   *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1377 n.4 (2018) (the doctrine "prevents the Government from using conditions to produce a result which it could not command directly"); *Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014) (crediting as viable an unconstitutional-conditions claim on First Amendment grounds where plaintiffs alleged that the government "conditioned their eligibility for the valuable benefit of [certain rights] on their willingness to limit their First Amendment right").   The July 6 Directive, by design, puts Johns Hopkins and other universities to the choice of either surrendering discretion on how best to continue academic instruction with sensitivity to COVID-19 (a real and grave threat to safety) or else subjecting international students to potential deportation.   Correspondingly, the Directive forces students holding F-1 visas to choose between attending classes in person, no matter the risks they face (including conditions that may make them specially at risk for COVID-19), or losing their

immigration status and, in some instances, the ability to complete their education.

For reasons already noted, it is all too clear that ICE is leveraging visa status toward invidious ends removed from its purpose—to make academic freedom yield to the Administration's political agenda.   Lest there be any doubt, the March Guidance acknowledged that the COVID-19 emergency warranted a shift to online classes by many universities.   Data and experience confirm that the reality of both the disease and university operations remain materially unchanged.   What has changed, apparently, is the Administration's agenda.   But "the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the [right at issue]."   *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994).

The rights at issue are especially cherished, for the Academy enjoys unique constitutional status.   Universities' educational autonomy falls under the protective umbrella of the First Amendment to the United States Constitution.   *Bakke*, 438 U.S. at 312 (1978) ("[a]cademic freedom" has "long has been viewed as a special concern of the First Amendment"); *Keyishian*, 385 U.S. at 603; *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring) (recognizing the "four essential freedoms of a university" include its right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study"). The government violates the Constitution when it restricts a university's freedom to determine "what shall be taught and how it shall be taught," "interferes with [an institution's] autonomous decisionmaking," or "intrudes upon [the] freedom to pursue their academic objectives without interference from the government."   *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 14–15, 19 (1st Cir. 2007).

Part and parcel of that educational autonomy is educators' exercise of discretion—and

discharge of responsibility—to balance the pursuit of their institutions' academic mission with the health and safety of students under their care.   Indeed, nothing can be more sacrosanct within the Academy.   The July 6 Directive impermissibly cudgels Johns Hopkins to forsake its carefully calibrated judgment—informed by the world's leading scientists and COVID-19 experts—about the scheduling and delivery of educational content.   Only by caving to ICE's drastic edict and revising its careful planning can Johns Hopkins protect international students from being summarily stripped of their immigration status and forced to flee the country.   The July 6 Directive cannot make the ability of Johns Hopkins' international students to enter or remain in the United States—and by extension, the university's ability to carry out its academic function and mission—wholly contingent on the forced transfer from the university to the government of the right to make protected academic judgments and determine how and under what conditions to provide instruction.   That amounts to an unconstitutional condition.   *Oil States Energy*, 138 S. Ct. at 1377 n.4.

As for international students who are being forced to choose between attending in-person classes or having their visas revoked, freedom of association under the First Amendment "plainly presupposes a freedom not to associate."   *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000).   It is difficult to imagine circumstances in which the right *not* to associate could be more important than during a global pandemic caused by a highly communicable and potentially lethal disease.   *See, e.g.*, Declaration of Student A ¶¶ 7, 9 (July 13, 2020).   Yet the intended effect of the July 6 Directive is to force international students to put themselves in harm's way or else lose their visas.   In that sense, the Directive is as cruel as it is unconstitutional.

## II.    ABSENT AN INJUNCTION, JOHNS HOPKINS WILL SUFFER IRREPARABLE HARM

The irreparable harm now faced by Johns Hopkins and its students is obvious, profound, and impossible to overstate.   A plaintiff seeking a temporary restraining order must show (1) risk of "great, actual, and imminent" harm, that is (2) likely to occur in the absence of an injunction, and for which (3) "no other adequate legal remedies [are] available."   *Wise v. United States*, 128 F. Supp. 3d 311, 319–20 (D.D.C. 2015).   The myriad injuries Johns Hopkins and its students imminently will suffer from the July 6 Directive amply satisfy this standard, as the U.S. District Court in Massachusetts has effectively recognized in confronting a parallel challenge and request for temporary restraining order by Harvard and MIT.   *See* Shaffer Decl., Ex. 4, at 9 ("I haven't seen the government's response to the TRO motion obviously, but my gut on it is that the big ticket item here is going to be likelihood of success on the merits.   I think that irreparable harm and the equities and the societal interest are going to be easier to wrestle with in this case.").

In particular, the Directive inflicts great harm by dislodging Johns Hopkins, right now, from its proper, autonomous exercise of discretion to manage its curriculum, its educational community, and its community's health while grappling with the pandemic.   Again, Johns Hopkins has constitutional rights in this regard, *see supra* 35–37, and deprivation of a constitutional right by itself works irreparable harm.   *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).   Even setting aside constitutional concerns, however, the stakes and injuries at play are enormous:   Mere weeks before the start of the fall semester, Johns Hopkins will have to scrap the plans it scrupulously crafted over prior months, or else put its international students' visas at risk.   Kumar Decl. ¶¶ 8–14; MacKenzie Decl. ¶¶ 5–7; Gange Decl. ¶¶ 5–15.   "Johns Hopkins cannot forsake its institutional duty and academic imperatives by taking steps that

would diminish the participation of international students in our academic programs.   But neither can we abdicate our responsibility to act in the best interest of the safety and well-being of our community.   The July 6 Directive will force us to choose one or the other.   I do not know how we can do that."   Kumar Decl. ¶ 25.   Harms such as this to "university employees and students" are "substantial injuries and even irreparable harms."   *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).

Most immediately, Johns Hopkins has no sound way to determine, in the next two days, whether any of its programs will be proceeding only through remote instruction; various academic divisions have not yet determined whether they will offer in-person instruction in addition to remote programs.   Kumar Decl. ¶ 17.   Yet ICE is nonetheless imposing a July 15 deadline for Johns Hopkins to so submit, and Johns Hopkins faces potentially severe consequences for any noncompliance.   *Id.*

Three weeks down the road, Johns Hopkins similarly cannot meet the August 4 deadline without incurring inordinate burdens, expense and exposure that can never thereafter be recovered.   Updating and reissuing a student's Form I-20 is a time-consuming process that would take an experienced administrator up to 30 minutes to complete.   Gange Decl. ¶ 20(e). According to the July 6 Directive, Johns Hopkins must go through this exercise for each of its more than 5,000 students by August 4.   Shaffer Decl., Ex. 1.   That translates to approximately 2,500 hours of work.   Gange Decl. ¶ 20(e).   Even if the university were staffed and braced (which it is not) to gather and update students' information in the forms on this tight timetable, many students will not have made their course selections by August 4.   *Id.*   But the July 6 Directive takes no account of these impediments and affords no give.   *See* Shaffer Decl., Ex. 1. And even if somehow there were enough hours in the day to process all the I-20 forms, and the

administrators had all the information necessary to do so, the July 6 Directive's terms are so confusing and unclear that, in many cases, administrators and students alike would be left guessing about what constitutes an "entirely online course load" even as they are obligated to certify definitively (under penalty of perjury) about whether they so qualify.   MacKenzie Decl. ¶ 11; Gange ¶ 20(g).

The July 6 Directive threatens irreparable injury to students too.   Johns Hopkins' international students are leading the charge on innovative, life-saving research (including COVID-19 research) and pursuing life-altering, world-class experiences with Johns Hopkins' laboratories, facilities, and faculty that they would be forced to abandon were they prohibited from starting the fall 2020 semester or abruptly forced to leave campus midway through if conditions require suspension of in-person learning.   Kumar Decl. ¶ 20.   Losing their visa status would also deprive these students of associated work permits (known as "Optional Practical Training" or "OPT") that allow them to enjoy the prized fruits of their studies and connections at Johns Hopkins (for which they have labored and invested so much) and explore possible employment in the United States for a period of time after they obtain their degrees. *Id.*   Still other students would face adverse conditions in their home countries, whether from COVID-19, civil war, unreliable (or nonexistent) Internet connections that make remote learning difficult (or impossible), and repressive regimes that do not permit studying sensitive academic materials, or other factors that prevent them from continuing their studies.   *Id.*; Student A Decl. ¶ 10; Student B Decl. ¶ 13; Student C Decl. ¶ 7; MacKenzie Decl. ¶ 12; Gange Decl. ¶ 20(a).

Of course, students also would be losing forever precious outlays associated with their tuition, leases, security deposits, and last-minute airfare, and some may face continuing student loan obligations for education they cannot access.   Moreover, these students and their families

will be at risk of being gratuitously exposed to the coronavirus if they are required to return home (assuming their countries will even admit travelers from the United States under current travel bans).   Student A Decl. ¶ 10; Student B Decl. ¶ 13; Student C Decl. ¶ 7; MacKenzie Decl. ¶ 12; Gange Decl. ¶ 20(a); *cf. Costa v. Bazron*, --- F. Supp. 3d ----, 2020 WL 2025701, at *8 (D.D.C. Apr. 25, 2020) (finding that "imminent risk to . . . health" from exposure to COVID-19 constitutes irreparable injury and granting temporary restraining order to patients in public health facility).   The litany of harms now confronted by international students—and, by extension, their families and communities—is too vast to do justice in this brief and is spelled out in greater detail in accompanying declarations.

Both the threat of physical harm and immigration consequences following agency action can constitute irreparable harm.   *See, e.g.*, *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 21, 44 (D.D.C. 2017) ("threat of removal proceedings, which plaintiffs w[ould] face" because of the challenged action established irreparable harm, even though there was no guarantee that class members would be subject to those proceedings or ultimately removed); *Int'l Long Term Care. v. Shalala*, 947 F. Supp. 15, 19 (D.D.C. 1996) (closing of a nursing home would create irreparable harm where it would cause residents physical trauma to move them elsewhere); *Petties v. District of Columbia*, 881 F. Supp. 63, 68 (D.D.C. 1995) (granting preliminary injunction against conduct that caused "stress and anxiety" and posed threat of "ever increasing mental, emotional and physical harm").

These harms to students flow back to Johns Hopkins in ways that are manifold and immeasurable.   When faced with the prospect of obtaining a Johns Hopkins degree via remote instruction from abroad, many students will opt for an alternative.   Kumar Decl. ¶ 21.   For many programs, particularly advanced-degree programs that attract a substantial proportion of

international students, in-class instruction may be a relatively minor aspect of the academic experience that pales in pedagogical import as compared to research, laboratory work, and internships.   *Id.*   Separately, in some countries—for example, China and India—degrees from international institutions earned via remote instruction may not be recognized and can mean some graduates are ineligible for some categories of jobs in those countries.   *Id.*   The bottom line, therefore, is that Johns Hopkins will lose students, thereby not only reducing tuition payments but requiring additional cash outlays from the university for teaching assistants, residential advisors, laboratory assistants, and similar positions that these students would have filled.   *Id.*; MacKenzie Decl. ¶ 11; Gange Decl. ¶ 20(c).   The Carey Business School, for example, has a large international student body and will face serious financial stress as a result of the number of students who may be forced to withdraw or defer enrollment.   Kumar Decl. ¶ 21. Monetary loss can constitute irreparable harm where it threatens the existence of a business or cannot be recovered due to, as here, sovereign immunity.   *TD Int'l, LLC v. Fleischmann*, 639 F. Supp. 2d 46, 48 (D.D.C. 2009); *Brendsel v. Office of Fed. Housing Enterprise Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004) (monetary injury caused by the federal government irreparable because sovereign immunity rendered the plaintiff "unable to sue to recover any monetary damages").   Similarly, the university stands to lose money it has paid to secure hotel rooms, subsidized by university funds and under long-term leases, that would not be needed if students with F-1 visas are forced to leave campus.   *Id.*

In sum, were this Court to use a sliding-scale approach, the irreparable harm evident in this case would effectively be dispositive.   Once combined with the legally suspect nature of the July 6 Directive, however, the warrant for emergency and preliminary relief is sealed.

**III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF ENJOINING THE JULY 6 DIRECTIVE**

The balance of harms and public interest overwhelmingly and uniformly align with Johns Hopkins.    The public interest and balance of equities factors "merge" when, as in this case, the government is "the opposing party."    *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). Here, these factors favor an injunction with singular force.

At the outset, Johns Hopkins' likelihood of success necessarily brings the equities and public interest onto its side.    Much as deprivations of constitutional rights pose concrete and irreparable harm, "it is always in the public interest to prevent the violation of a party's constitutional rights."    *Klayman v. Obama*, 957 F. Supp. 2d 1, 42 (D.D.C. 2013).    Indeed, the federal government can never elevate a policy goal "over the Due Process Clause."    *Gordon*, 721 F.3d at 653.    Likewise, "[t]he public interest is served when administrative agencies comply with their obligations under the APA."    *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).    Although that same rationale obtains in other APA challenges, there is much, much more at stake in this case, and all of it weighs on the side of the relief now sought.

Notably, emergency relief has been granted in other challenges to changes in immigration status and policy.    *See, e.g.*, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (granting preliminary injunction to prevent implementation of a government directive rescinding DACA and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) programs), *aff'd*, 809 F.3d 134 (5th Cir. 2015); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) (affirming grant of injunction to prevent implementation of Executive Order purporting to prevent "sanctuary jurisdictions" that did not cooperate in federal immigration enforcement efforts from receiving federal grants); *E. Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019) (granting injunction to prevent implementation by

DHS and Justice Department of joint interim final rule that would deny asylum to almost anyone entering the United States at the southern border if he or she did not first apply for asylum in Mexico or another third country), *aff'd*, No. 19-16487, 2020 WL 3637585 (9th Cir. July 6, 2020).   The warrant for relief in this particular case is no less compelling.

Consider all the international students—among the best and brightest—whose educations, fortunes, and futures now hang in the balance.   Next consider all of the many and varied contributions these students are making to their classes, their classmates, their communities, and their campuses at Johns Hopkins.   That is not to mention the immense real-time contributions these students are making to pioneering research, to data collection, to combating the scourge of COVID-19 throughout the United States and around the world.   Well beyond Johns Hopkins, these students are poised to contribute broadly and deeply—here and abroad—if only they can follow through on their studies and obtain their degrees.   Their families, significant others, and friends all stand to suffer if these students are suddenly uprooted—and, still worse, precisely when COVID-19 is spiking and then thrust into settings (like transoceanic flights) where they will be most exposed and most likely to port the disease with them.   And the entire public can only benefit from protecting students and universities against artificial pressure to return to classroom settings, without careful, ongoing regard for exposure risks.

The government may defend the July 6 Directive with characteristic vigor and ingenuity, but there can be no denying that a mass of important interests aligns with Johns Hopkins and its students as they seek to preserve the status quo before it is destroyed at the expense of learning, lives, and logical regard for the public interest.   Setting aside the political concerns of the Administration, immediate implementation of the Directive can do nothing to serve the public interest.   If the Court concludes, after full and fair litigation, that the July 6 Directive withstands

challenge on the merits, that is one thing.   But the Directive should not be permitted to do its worst until the Court can resolve the legal issues that call into question the Directive's validity.

## CONCLUSION

For the foregoing reasons, Johns Hopkins respectfully requests that the Court grant a temporary restraining order followed by a preliminary injunction prohibiting ICE's July 6, 2020 Directive regarding the Student and Exchange Visitor Program from taking effect pending resolution of the merits.

DATED:   July 13, 2020                     Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By    */s/ William A. Burck*
William A. Burck (D.C. Bar No. 979677)
Derek L. Shaffer (D.C. Bar No. 478775)
1300 I Street NW, 9th Floor
Washington, DC 20005
(202) 538-8000
williamburck@quinnemanuel.com
derekshaffer@quinnemanuel.com

Kathleen M. Sullivan*
Crystal Nix-Hines*
Shon Morgan*
Marina Lev*
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
kathleensullivan@quinnemanuel.com
shonmorgan@quinnemanuel.com
crystalnixhines@quinnemanuel.com
marinalev@quinnemanuel.com

*Motion for admission *pro hac vice* pending

*Attorneys for Plaintiff*
*Johns Hopkins University*