UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

JOHNS HOPKINS UNIVERSITY,                    )
                                             )
                                             )
                    Plaintiff,               )
        v.                                   )
                                             )   Case No. 20-1873 (DLF)
U.S. DEPARTMENT OF HOMELAND                  )
 SECURITY, et al.,                           )
                                             )
                    Defendants.              )
_____)

**OPPOSITION TO MOTION FOR A TEMPORARY RESTRAINING ORDER AND
REQUEST FOR A PRELIMINARY INJUNCTION**

**I.      INTRODUCTION**

In March 2020, U.S. Immigration and Customs Enforcement (ICE) exercised its discretion to temporarily permit nonimmigrant students to pursue a full course of study through 100 percent online classes as an initial response to the COVID-19 pandemic which struck during the middle of the spring semester.   This exercise of discretion made a temporary exception to the longstanding, existing rule that generally limited nonimmigrant students to "no more than the equivalent of one class or three credits per session, term, semester, trimester, or quarter" online or through distance education as part of the full course of study requirement. *See* 8 C.F.R. § 214.2(f)(6)(i)(G).  In a further exercise of that discretion, ICE has now modified that exception through a broadcast message issued July 6, 2020 that began a movement back toward the requirements of the longstanding, existing rule as a means of transitioning toward a measured re-opening for the fall semester that has been announced by some colleges and universities.

Plaintiff's argument attempts to elevate, erroneously, the initial March 2020 temporary exception as tantamount to the promulgation of a new rule that would be subject to the attendant

procedural requirements of such a rule.   In doing so, Plaintiff asks this Court to ignore the deference afforded administrative agencies in complex and interrelated fields like immigration enforcement, which requires coordination among multiple federal agencies including the U.S. Department of State and several components within the U.S. Department of Homeland Security, including U.S. Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and ICE.   Ultimately, ICE's exercise of discretion in responding to the fluid COVID-19 situation is neither arbitrary nor capricious, nor a violation of law.   Accordingly, Plaintiff's motion for a temporary restraining order should be denied.

### A.  Background

Nonimmigrants who are admitted to the United States under a F-1 or M-1 visa are subject to the requirements set forth in 8 U.S.C. § 1101(f), (m) and 8 U.S.C. § 1184.  *See also* 8 C.F.R. § 214.2(f), (m). A nonimmigrant who does not abide by the terms of his or her nonimmigrant status may be removable under INA § 237(a)(1)(C)(i), 8 U.S.C. § 1227(a)(1)(C)(i) for having "failed to maintain the nonimmigrant status  . . . or to comply with the conditions of such status." Federal law requires DHS to track and monitor U.S. educational institutions that enroll nonimmigrant students, as well as the students themselves while they reside in the United States in an F or M nonimmigrant status.  Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (September 30, 1996), authorized the creation of a program to collect current and ongoing information provided by schools and exchange visitor programs regarding F, M, and J nonimmigrants during the course of their stay in the United States, using electronic reporting technology to the fullest extent practicable. IIRIRA further authorized DHS to certify schools participating in F or M student enrollment. DHS carries out these obligations through ICE's

Student and Exchange Visitor Program (SEVP) which administers the Student and Exchange Visitor Information System (SEVIS).

Over the past two decades, Congress has repeatedly stressed the importance of monitoring nonimmigrant students noting national security concerns. *See e.g.*, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001, Pub. L. No. 107-56 (Oct. 26, 2001); Enhanced Border Security and Visa Entry Reform Act of 2002, (EBSVERA) Pub. L. No. 107-173, § 501 (May 14, 2002).  A solely online program of study provides a nonimmigrant student with the ability to be present anywhere in the United States for up to an entire academic term, whether that location has been reported to the government, which is contrary to several Congressional directives mandating the close and constant tracking of nonimmigrant students while they are present in the United States. Additionally, fully online programs raise concerns that such programs would likely facilitate a nonimmigrant student's participation in activities other than full-time study, which undermines the purpose of the F-1 nonimmigrant visa. There has been, and continues to be, a clear intent in the regulations governing nonimmigrant students that such students continue to meet the Congressionally-mandated requirements to be considered F nonimmigrant students, including that such students sought "to enter the United States temporarily and *solely for the purpose* of pursuing… a course of study." 8 U.S.C. § 1101(a)(15)(F)(i).  For context, there were over 1.5 million active records for F-1 and M-1 nonimmigrant students in SEVIS for calendar year 2018.  *See* https://www.ice.gov/news/releases/sevp-releases-2018-report-nonimmigrant-students-us#wcm-survey-target-id.

Significantly, EBSVERA instituted a two-year recertification process for all SEVP-certified schools requiring them to demonstrate compliance with recordkeeping and reporting requirements relating to schools and nonimmigrant students.  These statutes and their detailed requirements demonstrate clear Congressional intent that ICE closely monitor schools and students through SEVIS and vigorously enforce all regulatory requirements.

Federal regulations promulgated in accordance with these authorities set forth the conditions of F and M nonimmigrant status, which require the fulltime pursuit of a course of study.  *See* 8 C.F.R. § 214.2(f)(5), (m)(5) (discussing maintenance of a "full course of study" as a requirement to maintain nonimmigrant status).  The regulations also provide, however, that most F-1 nonimmigrant students may take "no more than the equivalent of one class or three credits per session, term, semester, trimester, or quarter" online or through distance education as part of the full course of study requirement.  *Id.* § 214.2(f)(6)(i)(G).  An online or distance education course is defined as "a course that is offered principally through the use of television, audio, or computer transmission including open broadcast, closed circuit, cable, microwave, or satellite, audio conferencing, or computer conferencing." *Id*. F-1 students in a language study program and M-1 students may count no online or distance education courses toward a full course of study. 8 C.F.R. § 214.2(f)(6)(i)(G), (m)(9)(v). So, significantly, while some students are not permitted to take any online study, no nonimmigrant student may exceed the regulatory limit prescribed by § 214.2(f)(6)(i)(G).

Ensuring compliance with these requirements is shared by U.S. Department of State (issuing F-1 and M-1 nonimmigrant student visas and administering the J-1 program), U.S. Customs and Border Protection (admission), and ICE, specifically the SEVP. SEVP provides approval and oversight to schools authorized to enroll F and M nonimmigrant students and gives

guidance to both schools and students about the nonimmigrant student regulatory requirements. SEVP is part of the National Security Investigations Division and acts as a bridge for government organizations that have an interest in information on nonimmigrants whose primary reason for coming to the United States is to study.

### B. COVID-19

ICE, in coordination with DHS and other federal, state, and local agencies has implemented a variety of programs, including altered enforcement priorities and adapted agency policies and practices in response to the unprecedented global pandemic of the novel coronavirus 2019 (COVID-19). The goals of these adaptations are to ensure safety of the public and to help detect and slow the spread of the virus. ICE recognizes this is a fluid situation and provides updates on www.ice.gov to provide the public notice of these policies as they relate to multiple facets of ICE operations.

### C. SEVP Policy Announcements

At issue in this case is a July 6, 2020 message to SEVIS users, which provided notice to schools and nonimmigrant students of how ICE would exercise its discretion beginning in the fall of 2020 in light of the impact of COVID-19 on educational institutions. *See* Broadcast Message: Fall 2020 Guidance (July 2020), https://www.ice.gov/coronavirus.[1] However, the July 6 message is but the latest discretionary decision in a series of actions by SEVP in response to the COVID-19 pandemic.

Beginning on January 29, 2020, SEVP issued a broadcast message in response to several inquiries regarding COVID-19 and the potential impact on F and M nonimmigrant students. *See*

---

[1] SEVP Broadcast messages are available at https://www.ice.gov/coronavirus under the tab "Nonimmigration Students and SEVP-Certified Schools" in the "Guidance Documents" section. Also relevant is the "Frequently Asked Questions" tab.

Broadcast Message: COVID-19 F and M Nonimmigrants (Jan. 2020).  (Ex. 1 hereto).  The broadcast message focused on international travel and permissible reductions of courses if medically authorized.  The broadcast also reminded schools of flexibilities already built into the federal regulations to address various needs of nonimmigrant students in light of COVID-19. The January guidance allows for impacted parties to submit comments to the broadcast message and clearly states that it "is not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP."

On March 9, 2020, SEVP issued another broadcast message, superseding the January broadcast, advising F and M nonimmigrant students, SEVP-certified schools, and other stakeholders that ICE would be permitting certain flexibilities to nonimmigrant students who were seeking to maintain their status in light of the COVID-19 pandemic. *See* Broadcast Message: COVID-19 and potential Procedural Adaptations for F and M Nonimmigrant Students (Mar. 2020).  (Ex. 2 hereto).   Appendix 1 of the March 9 broadcast message explains the requests that SEVP made of schools in March to maintain integrity of the nonimmigrant student program in accordance with these flexibilities.  As with the January broadcast, the March broadcast reiterated that it "is not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP."  (Ex. 2 hereto at 2).  The March broadcast also explicitly indicates "SEVP is monitoring this situation closely. The program will supplement this guidance with additional information and will adjust guidance as needed."  (*Id.*)

As a "follow up" to the March 9 broadcast message, SEVP also released "COVID-19: Guidance for SEVP Stakeholders" on March 13, 2020, to provide clarification on the effects of the March 9 announcement.  (Ex. 2 hereto, at 4-5).  Specifically, as is relevant to Plaintiff's contentions here, the March 13 broadcast provided guidance with respect to a scenario in which a

SEVP-certified learning institution, as an "emergency procedure[]" in response to the emerging COVID-19 pandemic, "temporarily stops in-person classes but implements online or other alternate learning procedures and the nonimmigrant student remains in the United States."  (Ex. 2 hereto at 4).  In that scenario, the guidance explained that "[g]iven the extraordinary nature of the COVID-19 emergency, SEVP will allow F-1 and/or M-1 students to temporarily count online classes towards a full course of study in excess of the limits stated in 8 CFR 214.2(f)(6)(i)(G) and 8 CFR 214.2(m)(9)(v). This temporary provision is only in effect for the duration of the emergency and in accordance with the procedural change documents filed in a timely manner to SEVP."  (Ex. 2 hereto at 4).

In understanding this guidance, context is critical.  At the time of this announcement, it was the middle of the spring semester and large segments of the country were abruptly moving toward maximum telework as an initial response to COVID-19, which had been declared a pandemic by the World Health Organization just two days earlier.  *See, e.g.* https://www.opm.gov/policy-data-oversight/covid-19/fact-sheet-additional-guidance-in-connection-with-the-covid-19-emergency.   The movement to maximum telework (and corresponding movement toward remote learning) was always contemplated to be a *temporary* transition and, indeed, beginning in June 2020, that trend began to reverse as various government agencies began to initiate a phased return to the office, and some universities announced that students would return to campus for the fall semester.  *See, e.g.*, https://federalnewsnetwork.com/workforce/2020/06/usda-enters-phase-one-employees-gradually-returning-to-d-c-area-offices; https://news.virginia.edu/content/uva-outlines-return-grounds-plan-fall-academic-semester.   In Maryland, where Johns Hopkins' campus is located, the Governor announced the transition to a "phase two" reopening of the State in mid-June.  *See*

https://governor.maryland.gov/2020/06/10/governor-hogan-announces-next-stage-two-reopenings-including-indoor-dining-and-outdoor-amusements.

Plaintiff's argument focuses on the language in the March 13, 2020 guidance stating that "[t]his temporary provision is only in effect for the duration of the emergency," contending that the term "emergency" necessarily is a reference to certain emergency declarations also made around the same time and which still remain in effect.  However, the term "emergency" is not defined in the guidance and can reasonably be understood instead as the "emergency" that the pandemic presented in the middle of a school semester and the abrupt transition to maximum telework (and remote learning) that occurred as an initial response and which now is beginning to be reversed.   That is how ICE has indicated it understands the term, as explained in the Frequently Asked Question ("FAQ") document, last updated July 7, 2020.  In that document, ICE explained that the March 2020 guidance was announced because "DHS was faced with an urgent need to address challenges in this area mid-semester as the COVID-19 situation began evolving."  (Ex. 6, July 7 FAQ at 2).

On March 24, 2020, SEVP issued a supplemental broadcast message identifying the location of publicly available COVID-19 related guidance and reminding stakeholders to "notify SEVP of any procedural adaptation due to COVID-19 within 10 business days of the change." (Ex. 3 hereto).  The March 24 guidance also allows for individuals to provide comments, advises the situation remains fluid and includes the same disclaimer as both the January and March 9 broadcast messages.

On April 15, 2020, SEVP issued a supplemental broadcast message, reminding stakeholders to "submit their procedural modifications to SEVP within 10 business days of the date of determining the change, in accordance [with the March 9] Broadcast."  (Ex. 4 hereto).  At

the time of the broadcast, SEVP had received 6,000 operational modification documents from schools across the nation. The April Broadcast includes the same opportunity to comment and disclaimer as in previous broadcasts.

On July 6, 2020, ICE issued a press release and SEVP issued a broadcast message, which outlines the temporary procedural adaptions which shall be implemented for the fall 2020 semester. The Broadcast recognizes "[t]here will still be accommodations to provide flexibility to schools and nonimmigrant students, but as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations." (Ex. 5) The goal of this announcement was to provide advance notice that a temporary rule change would be coming before the fall 2020 semester. This message states that it "is intended to provide additional time to facilitate the implementation of these procedures," and that it does not create any right or benefit. (Ex. 5 at 1, 3) This is the same disclaimer as on other broadcast messages.

On July 7, 2020, SEVP published a Frequently Asked Questions (FAQ) document, which further explains the July 6, 2020 broadcast message. (Ex. 6 hereto). Among other things, that FAQ explains that the March 2020 guidance is currently in effect through the end of the summer semesters. The FAQ also provides an explanation justifying the change in policy for the fall semester, namely "to maximize flexibility for students to continue their studies, while minimizing the risk of transmission of COVID-19 by not admitting students into the country who do not need to be present to attend classes in-person." (*Id.* at 2).

One of the main policy decisions Plaintiff takes issue within this case is the following guidance:

"Students attending schools operating entirely online may ***not*** take a full online course load and remain in the United States. The U.S. Department of State will

9

not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States. Active students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status or potentially face immigration consequences including, but not limited to, the initiation of removal proceedings."

This guidance reflects the coordination between SEVP, CBP and the U.S. Department of State regarding nonimmigrant F and M visa holders and the interrelationship between these agencies in enforcing immigration law as applied to nonimmigrant students.

In addition, the July 6 broadcast message set forth several reporting requirements. First, schools must reissue Forms I-20 to all students within 21 business days of July 6 to reflect any relevant changes in the student's program enrollment and information, pursuant to 8 C.F.R. § 214.3(g)(2). Second, schools that offer entirely online classes or programs or will not reopen for the fall 2020 semester must complete an operational change plan and submit it to SEVP no later than Wednesday, July 15, 2020. Third, all other operational plans implemented by the school must be reported within 10 days of the change. Fourth, for all students attending schools in the United States this fall 2020, the school must issue new Forms I-20 to each student.

Students will not be permitted to enter or remain in the United States to attend schools that are conducting classes entirely online, consistent with the current regulatory limitations found at 8 C.F.R. 214.2(f), (m), but they are not barred from continuing to attend all classes at these schools from abroad, and their SEVIS records may remain in "Active" status while studying online, outside the United States. SEVP's guidance for fall 2020 will take effect at the start of a school's defined fall semester. Certified schools' compliance with the regulatory reporting requirements is essential to ensure that foreign students are following the statutory and regulatory requirements to maintain their nonimmigrant status.

If foreign students are not attending in person classes within the United States, the statutory and regulatory requirements do not allow for them to remain within the United States. Thus, the requirement to depart is grounded in statute. INA § 237(a)(1)(C)(i), 8 U.S.C. § 1227(a)(1)(C)(i).  When foreign students fail to maintain their nonimmigrant student status, they must depart or they risk being placed in removal proceedings. *Id.* This is not new. The regulation explicitly excludes 100 percent online course loads. Plaintiff does not argue ICE should revert to the black letter of the regulation, but instead contests ICE's discretionary decision to temporarily adjust its enforcement posture in response to the COVID-19 pandemic, which arose mid-semester this past spring. As such, the July 6 message is nothing more than a reminder that students must depart should they violate the terms of their nonimmigrant student visa.

SEVP guidance has repeatedly advised stakeholders that the agency's position during the pandemic is fluid. Given the volatile nature of the pandemic, SEVP guidance warns all schools and students that the guidance may be altered or superseded *at any time*.  At no time did the agency issue a final rule limiting SEVP's discretionary enforcement authority during the pandemic.

Instead, SEVP continues to adapt and adjust enforcement priorities in accordance with the law and as a proper exercise of the agency's discretion.  Plaintiff's motion for a temporary restraining order seeks to freeze a single policy decision in time. If granted, the agency will be unable to respond to new developments of this unprecedented health crisis until Plaintiff, or other similarly situated private entities, deem appropriate. The court should deny the motion for a temporary restraining order and for a preliminary injunction.

## II.   PLAINTIFF IS NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER OR ANY INJUNCTIVE RELIEF

### A.   Legal Standard

A temporary restraining order "is an extraordinary, if not drastic, remedy." *Nat'l Treasury Emps. Union v. United States*, 2019 WL 266381, at *2 (D.D.C.). It is "reserved for cases where plaintiffs will suffer irreparable injury before a preliminary injunction hearing is even held." *Id.* "An application for a TRO is analyzed using factors applicable to preliminary injunctive relief." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 81 (D.D.C. 2018).

Similarly, "a preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Hospitality Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D. D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, 2018 WL 3232515, at *4 (D.D.C. 2018) (quoting *Davis v. PBGC*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). This Circuit has suggested, without deciding, that *Winter*—which overturned the Ninth Circuit's "possibility of irreparable harm"

standard— "should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Bartko v. Dep't of Justice*, 2015 WL 13673371, at *1 (D.D.C. 2015) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011), and *Davis*, 571 F.3d at 1292); *see also League of Women Voters*, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after *Winter*).

Even before *Winter*, courts in this circuit consistently stressed that "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Thus, "if a party makes no showing of irreparable injury, the court may deny the motion without considering the other factors." *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (quoting *CityFed Fin. Corp.*, 58 F.3d at 747); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is … grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

A movant alleging "speculative injuries" cannot meet the "'high standard for irreparable injury' sufficient to warrant the extraordinary relief of a TRO," and "the Court need not reach the other factors relevant to the issue of injunctive relief." *United Farm Workers v. Chao*, 593 F. Supp. 2d 166, 171 (D.D.C. 2009) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297); *see Bartko*, 2015 WL 13673371 at *2 ("[t]he Court need not grant injunctive relief 'against something merely feared as liable to occur at some indefinite time'") (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "[T]he movant must demonstrate the injury is of such 'imminence' that there is a clear and present need to equitable relief to prevent irreparable

harm." *Id.* (quoting *Judicial Watch, Inc. v. Dep't of Homeland Security*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007). And where a party seeks to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet an even higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006) (citing authorities).

### B. Plaintiff Is Unlikely To Succeed On The Merits Of Its Claims

#### 1.    The July 6 Broadcast Message Is Not Arbitrary And Capricious

The Supreme Court has made clear that, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The arbitrary and capricious standard is "[h]ighly deferential," and "presumes the validity of agency decisions." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000).  Deference is especially appropriate in areas that are "complex and highly technical." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991); *see, e.g., American Farm Bureau Fed. v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009); *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008).  Additionally, it is appropriate to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs.* 463 U.S. at 43 (citing *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974)).  The record need not include explicit discussion of every factor that is relevant to the agency's decision so long as the bases for the agency's policy choices are otherwise clear from the nature and context of the challenged action.  *See Domtar Maine Corp. v. FERC*, 347 F.3d 304, 311-12 (D.C. Cir. 2003), *cert. denied*, 541 U.S. 1029 (2004).

Plaintiff is unlikely to succeed on the merits of its APA claims because its arguments that the agency did not provide a rationale for the July 6 guidance or consider important aspects of the COVID-19 emergency are incorrect. The agency's guidance to its stakeholders was not contained solely in the broadcast messages published regularly beginning as early as January 29, 2020, but also included information on the ICE websites, including https://www.ice.gov/coronavirus, and in the FAQ documents posted on the site, both of which were updated regularly.

The FAQ, as last updated July 7, 2020, explained that the March 2020 guidance was announced because "DHS was faced with an urgent need to address challenges in this area mid-semester as the COVID-19 situation began evolving."  (Ex. 6, July 7 FAQ at 2)  That guidance was an exception to the longstanding rule, based on previously articulated policy rationales that limited the amount of online classes nonimmigrant students could take while remaining in country.

"Heading into a new semester this fall," however, DHS has determined that a new approach was warranted (*id.*), consistent with the trend to begin transitioning back to the office place and classroom.   That new approach is reflected in the July 6 broadcast message, which sought to "balance public health concerns against the varied approaches that schools and universities are taking to combat the spread of COVID-19." (*Id.*)  DHS explained that, under its "fall 2020 guidance, all students scheduled to study at a U.S. institution in the fall will be able to do so, though some will be required to study from abroad if their presence is not required for any in-person classes in the United States." (*Id.*)   DHS further explained that, "[t]hrough this guidance, DHS is seeking to maximize flexibility for students to continue

their studies, while minimizing the risk of transmission of COVID-19 by not admitting students into the country who do not need to be present to attend classes in-person." (*Id.*)

Thus, the rationale for this guidance was clearly articulated. If nonimmigrant students do not need to be present in the United States to attend classes in-person because the school they attend only is offering remote learning, then, to help "minimiz[e] the risk of spread of COVID-19 in our communities," they "will not be permitted to enter or remain in the United States to attend such schools *but they are not barred from continuing to attend all classes at these schools from abroad*." (*Id.* at 3)  Underlying this rationale is the longstanding requirement that nonimmigrant students complete their program of study in person, rather than fully online or through distance education. *See* 8 C.F.R. § 214.2(f)(6)(i)(G).  The rationale for that requirement is reflected in the Notice of Proposed Rulemaking issued almost 20 years ago (in May 2002), which proposed to add subsection (G) to 8 C.F.R. § 214.2(f)(6)(i).  In that Notice, the Immigration and Naturalization Service explained, "[w]hile on-line and distance education programs can be highly innovative means to augment or even conduct an educational program, the entry of a foreign student into the United States becomes unnecessary if *the bulk of the program* does not require the student's physical presence. Therefore, this rule proposes to limit the enrollment of F-1 and M-1 students in courses that are on-line or through distance education programs and do not require the student's actual presence." 67 Fed. Reg. 34862 at 34866 (emphasis added).

For context, there were over 1.5 million active records for F-1 and M-1 nonimmigrant students in SEVIS during 2018.  *See* https://www.ice.gov/news/releases/sevp-releases-2018-report-nonimmigrant-students-us#wcm-survey-target-id.  Thus, the July 6 broadcast reflected the agency's reasoned determination that the presence of nonimmigrant students unnecessarily in

the United States could increase the spread of COVID-19 and would be inconsistent with the policies underlying the existing, longstanding rule that prohibits 100 percent remote learning.

As reflected above, ICE considered numerous aspects of the situation presented by COVID-19, namely, public health concerns, the variety of approaches schools were taking as a result of such concerns, and the underlying and longstanding requirement that  nonimmigrant students complete their program of study in person, rather than fully online or through distance education.  In addition, the FAQ documents all have included the following statement:

> Note: SEVP continues to actively monitor COVID-19 and provide up-to-date information to stakeholders, including designated school officials (DSOs) and F and M students. Due to the fluid nature of this situation, the answers in this document may be subject to change. Refer to ICE.gov/COVID19 for the most up-to-date version of this FAQ.

*Frequently Asked Questions for SEVP Stakeholders about COVID-19*, pg.1

(https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf) (attached hereto).  This notice clearly indicates the agency's continuing evaluation of the COVID-19 situation as it developed, and the agency's posture as it changed. This FAQ demonstrates that ICE considered at least two additional aspects of the situation that Plaintiff fails to recognize, the fluid nature of the COVID-19 pandemic and the urgent need to provide guidance regarding its impact.  Both by providing notice that its guidance was subject to change, and regularly updating, expanding upon, and adjusting its guidance to stakeholders, ICE has demonstrated that it not only considered important aspects of the situation it faced, but also that it reacted to changes in that situation, shifted its posture accordingly, and responded to its stakeholders' questions and requests for additional information to keep them appropriately advised.

Further, the July 6 message demonstrates ICE's balancing to both vigorously enforce statutory and regulatory requirements, and the need for U.S. educational institutions to maintain some measure of flexibility in their modes of instruction in light of the ongoing pandemic. If ICE

had not considered the schools impacted by its decision, or the vast differences among them regarding plans for reopening in the fall, perhaps the agency would have completely rescinded its March 9, 2020 broadcast message and reverted back to enforcement of the black letter of the regulations, returning to the status quo before the COVID-19 emergency. To have done so would have limited foreign students to count no more than one class or three credits per semester or term offered fully online or by distance education towards the full course of study requirement for maintaining their nonimmigrant status. *See* 8 C.F.R. § 214.2(f)(6)(i)(G).

Instead, ICE made the decision to exercise its discretion to adjust its March guidance. (Ex. 5, July 6 broadcast message at 1). The agency offered three possible scenarios, including offering students the ability to exceed the regulatory limitations on online study at schools employing a hybrid approach of offering both in person and online classes.[2] This modified approach to the Fall 2020 semester demonstrates that ICE considered and balanced the equities of schools, foreign students, and the agency's need to uphold and enforce the immigration laws and regulations within the United States.

Plaintiff's argument to the contrary is based on an incorrect premise, that the July 6 message suddenly forces foreign students to attend in-person classes to maintain their nonimmigrant status.   In fact, the regulations governing the maintenance of nonimmigrant status for aliens present in the United States pursuant to an F-1 visa, are settled and longstanding, and

---

[2]      ICE also offered two other scenarios for schools with plans to reopen in the fall: 1) for schools intending to operate entirely online, foreign students would be able to fully participate in these programs from outside the United States, and 2) for schools intending to operate as normal, with fully in-person classes, nonimmigrant students in the United States would be bound by existing regulations limiting F students, with the exception of F nonimmigrant students enrolled in English language programs, to count one class or three credits of online or distance education study towards the full course of study regulatory requirements for such students.  M nonimmigrant students, in accord with existing regulations, would also be prohibited from engaging in online study under this scenario.

have required that students complete their program of study in person, rather than fully online or through distance education, for nearly two decades. *See* 8 C.F.R. § 214.2(f)(6)(i)(G).

Plaintiff's argument that the agency failed to offer a rationale or justification for the July 6 broadcast message, and failed to consider important aspects of the problem, thus fails. There is a direct correlation between the existing obligations of aliens present in the country for the purposes of studying at a U.S. educational institution, and the requirements outlined by ICE in the July 6 policy announcement. Rather than completely rescinding the March guidance and reverting to the pre-COVID status quo with respect to schools and foreign students, ICE announced a measured transition to begin a move toward reopening schools and allowing students to return to classrooms, consistent with the overall movement to a gradual reopening of the country.  ICE justified its shift by stating, "as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations." (July 6 broadcast message at 1).  As such, ICE offered its rationale and justification for the decision throughout the July 6 policy announcement. It is not necessary that the Court or Plaintiff's agree with the government's rationale for it to be considered sufficient for the purposes of meeting APA requirements.  Rather, it is well-settled that, if the Court finds a reasonable basis for the agency's action, the Court must affirm that action even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the regulation or standard at issue. *See Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984).

Plaintiff's argument that the July 6 message failed to consider Johns Hopkins and its students' reliance on the March 2020 broadcast message fails for a similar reason.  ICE has maintained for months that the situation was rapidly evolving and that its guidance was

accordingly subject to change.   The March 9, 2020 message included the following disclaimer:
"This Broadcast Message is not a substitute for applicable legal requirements, nor is it itself a
rule or a final action by SEVP. It is not intended to, does not, and may not be relied upon to
create any right or benefit, substantive or procedural, enforceable at law by any party in any
administrative, civil or criminal matter."  (Ex. 2, March 9 Broadcast Message at 2)  The March
13, 2020 message provided notice that "[d]ue to the fluid nature of this difficult situation, this
guidance may be subject to change. SEVP will continue to monitor the COVID-19 situation and
will adjust its guidance as needed."  (Ex. 2, March 13 Guidance at 5)

Thus, although the March 13 Guidance also stated that this "temporary provision" would
be "only in effect for the duration of the emergency," that language cannot be considered in a
vacuum as handcuffing the agency in perpetuity.  When the March 2020 documents (i.e., March
9 broadcast message and March 13 "follow up") are considered in  context, they cannot
reasonably be construed as stating definitively that the temporary exception would continue
unchanged "'so long as the COVID-19 crisis remained in effect'" as Plaintiff incorrectly
contends.  (Mot. at 24).  Rather, as explained in the June 7 FAQ, the "emergency" to which the
March 13 guidance was responding, concerned the "urgent need to address challenges in this
area mid-semester as the COVID-19 situation began evolving."  (Ex. 6, July 7 FAQ at 2)  At the
very least, that is a reasonable interpretation of the undefined term "emergency" as used in the
agency's own March 13 message.

Accordingly, Plaintiff cannot contend that they had a reliance interest in the March 13,
2020 mid-semester message that the agency was required to expressly address in their July 6,
2020 summer break message.  The March 2020 guidance clearly indicated that it was only a
temporary exception to the longstanding requirement of in-person classes for nonimmigrant

20

students, that the situation remained fluid and that the guidance was subject to change.  SEVP-approved schools and foreign students, moreover, are required to be aware of the obligations and restrictions governing their actions under federal regulations, including the longstanding requirement, and policy rationale, for in-person classes.

### 2. The July 6 Broadcast Message Is In Accordance With The Law.

Plaintiff's contention that the July 6 broadcast message is "not otherwise in accordance with the law" (Mot. at 25) is equally misplaced.  The law is that stated in 8 C.F.R. § 214.2(f)(6)(i)(G), which limits the number of online classes that nonimmigrant students may take, not the single sentence in the March 13 guidance that Plaintiff takes out of context (i.e., that "[t]his temporary provision is only in effect for the duration of the emergency").  The March 2020 guidance was a temporary exception to that longstanding rule.  Moreover, the March 9 broadcast message (to which the March 13 guidance directly relates) states on its face that it "is not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil or criminal matter."  (Ex. 2 at 2).  Accordingly, in light of that disclaimer, Plaintiff cannot contend that the July 6 message was "not otherwise in accordance with the law" based on the March 2020 guidance.

### 3. The July 2020 Broadcast Message Is Exempt From APA Notice and Comment.

The July 6 message was not subject to the APA's notice and comment requirements because it was not a legislative rule, but, at most, a statement of policy.  The APA provides an exception to its notice-and-comment requirements for "general statements of policy."  5 U.S.C. § 553(b)(A).  A statement of policy "genuinely leaves the agency and its decisionmakers free to

exercise discretion" when applying the policy and does not create a "binding norm." *Am. Bus. Ass'n v. United States*, 627 F.2d 525, 529 (D.C. Cir. 1980).

In this case, ICE's July 6 message was not a rule subject to the notice-and-comment requirements of section 553, as it was not intended to have any legal effect or impose any binding norms.  The July 6 message—by its own express terms—was intended solely to provide advance notice to the public that, through a forthcoming publication in the *Federal Register*, DHS would be promulgating a new rule for the coming academic year.  Through the July 6 Broadcast Message, DHS announced that it would publish a "Temporary Final Rule" to address the interplay of schools offering online coursework due to COVID-19 and the ability of F-1 nonimmigrants to maintain their status.  (Ex. 5, July 6 Broadcast Message at 1)  The July 6 message was publicly released and sent directly to SEVP-certified schools as a Broadcast Message to give stakeholders the opportunity to prepare in advance for a regulatory change that would likely require immediate action. Nothing in the July 6 message itself requires ICE to take administrative compliance actions against schools that do not complete reporting in accordance with the deadlines laid out.[3]  Nor does the July 6 message mandate that ICE initiate removal proceedings against F-1 nonimmigrants for failure to abide by the terms of their nonimmigrant status.

---

[3]      To the extent that the July 6 broadcast message sets deadlines for SEVP-certified schools to report changes to their operational plans and re-issue I-20s, these deadlines are intended to provide DHS with enough time to obtain and digest the information necessary to uphold its statutory obligations to collect, verify, and monitor information on those in F-1 status. *See* 8 U.S.C. § 1372.  For instance, without knowing whether a school would be open for the Fall 2020 semester, DHS would lack the information needed to determine whether an F-1 student seeking admission to the United States to pursue a course of study at that school were eligible for admission.  The July 6 broadcast message permits schools to submit updated operational plans if circumstances regarding their operational posture should change.  (Ex. 5 at 3)

Implicit in Plaintiff's argument is the contention that DHS's March 2020 announcement was a modification of federal regulations that could only be subsequently modified through the APA's notice-and-comment process.  But the March 2020 announcement contained a disclaimer that it is "not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil or criminal matter."  (Ex. 2, March 9 Broadcast Message at 2)  And, the July 6 announcement, which contains a similar disclaimer, likewise has no legal effect and establishes no such binding norms.

DHS's March 2020 announcement was issued as a function of DHS's "absolute discretion" to decline to bring enforcement actions against F-1 students and certified schools who would have been operating in violation of the federal regulations when shifting to a fully online instruction model in light of the COVID-19 emergency.  *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (holding that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion").  Thus, the July 6 message did not implement, or purport to implement, a change to the longstanding federal regulations regarding the amount of online coursework foreign students could take and remain in compliance with the terms of their status.  As stated in the July 6 broadcast message, the actual "procedures and responsibilities" comprising the regulatory change would be published "in the near future as a Temporary Final Rule in the Federal Register."  But the July 6 message itself was released "to provide additional time to facilitate the implementation of these procedures."  (Ex. 5, July 6 Broadcast Message at 1)

4.   **Plaintiff's Due Process and Other Constitutional Arguments Fail For Similar Reasons.**

Plaintiff alleges violations of its due process rights based on the same grounds it challenges the agency's actions under the APA. As demonstrated in the discussion and argument above, Plaintiff's APA claims fail as a matter of law, and thus so should its due process claims. "Protection against governmental arbitrariness is the core of due process." *County. of Sacramento v. Lewis*, 523 U.S. 833, 834 (1998) (*citing Hurtado v. California*, 110 U.S. 516, 527 (1884)). However, "only the most egregious executive action can be said to be arbitrary in the constitutional sense." *Id.* This standard necessarily presents a higher threshold than what is required to demonstrate arbitrariness under the APA. *See Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F.Supp. 2d 59, 80 (D.D.C. 2009) ("[The agency's] decision-making was not arbitrary under the APA; *a fortiori* its decision was not so arbitrary that it was of the most egregious type prohibited by the Constitution."); *see also Holiday CVS, Inc. v. Holder*, 2012 U.S. Dist. LEXIS 35201, at *53 (D.D.C. Mar. 16, 2012) ("Here, it has already been determined that the DEA's imminent danger finding was not arbitrary and capricious for the purposes of APA review. That rationale applies with equal force to the plaintiffs' procedural due process claim.").

Where, as here, an agency's actions complied with the procedural requirements under the APA, due process claims—for which there is a higher threshold—that challenge the very same agency actions, cannot be sustained. *See Empresa Cubana*, 606 F.Supp.2d at 80. Since ICE complied with the requirements of the APA and its applicable statutes and regulations, its actions could not possibly have been "of the most egregious type" in violation of the due process clause. *See id.* Plaintiff's due process claims should therefore be rejected.

Plaintiff's constitutional claim also fails because it lacks the requisite property interest

under which to pursue a claim for violation of due process.  A constitutionally protected property interests exists only when a party has a "legitimate claim of entitlement to it."  *PDK Labs. Inc. v. Reno*, 134 F.Supp.2d 24, 32 (D.D.C. 2001) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  Statutes and regulations can confer such an entitlement when there are "substantive limitations on official discretion," *Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997) (citation omitted), including situations in which a government agency is required to take an action or confer benefits after certain prerequisites are met, *Tarpeh-Doe v. United States*, 904 F.2d 719, 723 (D.C. Cir. 1990).

However, when an agency has broad discretion to implement a statute that confers benefits, there is no constitutionally protected property interest.  *Wash. Legal Clinic*, 107 F.3d at 36 (citing *Roth*, 408 U.S. at 567) (ruling that local officials were given broad discretion to determine housing eligibility to defeat the claim that a local ordinance giving the homeless a "right" to shelter conferred an actual property right on the homeless).  In order to create a legally cognizable property interest, "the regulations [must] contain 'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Tarpeh-Doe*, 904 F.2d at 723 (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989)).

Here, the longstanding regulation requires that nonimmigrant students maintain a majority of in-person classes, and the March 2020 guidance was simply a temporary exception to that longstanding rule implemented through the exercise of ICE's discretion.  The disclaimer on the March 9, 2020 message makes clear that the guidance created no right or benefit.  Thus, far from placing "substantive limitations on official discretion," the March 2020 guidance was, on its face, expressly subject to change as the situation evolved.   The July 6 message simply

25

modified that guidance in a further exercise of ICE's discretion in light of changing circumstances.

Plaintiff's other constitutional arguments are equally baseless and rest on the same false premise – that the March 2020 guidance somehow amounted to a new rule promulgated by the agency that altered in some permanent way the longstanding rule requiring in-person classes.  To the contrary, the March 2020 guidance constituted a temporary exception through the exercise of ICE's discretion that remained subject to modification through further exercise of that same discretion.  Accordingly, Plaintiff cannot meaningfully contend that the July 6 guidance usurps academic freedom or imposes unconstitutional conditions when it is *less* stringent than the longstanding rule that has been in place for almost 20 years.

### C. Plaintiff Has Not Demonstrated That It Will Suffer Irreparable Harm And The Balance Of Equities Favors Defendants.

"Regardless of how the other three factors are analyzed, it is required that the movant demonstrate an irreparable injury." *Mdewakanton Sioux Indians of Minnesota*, 255 F. Supp. 3d 48, 51 (D.D.C. 2017) (footnote omitted). "The basis of injunctive relief in the federal courts has always been irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974); *see also CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). The Supreme Court's "frequently reiterated standard requires Petitioners seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Moreover, conclusory or speculative allegations are not enough to establish a likelihood of irreparable harm. *Henke*, 842 F. Supp. 2d at 59.  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22; *Northeastern*

*Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)
(irreparable injury must be neither remote nor speculative, but actual and imminent). Plaintiff has
failed to make this showing.

Plaintiff takes issue with the change in policy regarding fully online coursework.  But the
July policy does not require universities to cease providing online learning classes. In fact, the
policy explicitly recognizes that universities may choose to do so, and if so, students choosing a
100 percent online learning program do not need to be physically present in the United States.
Under the July 6 Broadcast Message, students are not barred from continuing to attend all
classes at their respective schools from abroad.  (Ex. 6, July 7 FAQ at 3)  The guidance simply
states that students who do not have sufficient in-person classes will not be permitted to remain
in the United States to attend school.

Plaintiff mischaracterizes the July 15 deadline set forth in the July 6 broadcast message to
suggest that it must make a final, irreversible operational determination by that date or face
"potentially severe consequences for any noncompliance."  (Pl. Mot. at 4)  But, in making that
argument, they ignore language in the July 6 broadcast stating that "[s]chools should update
their operational plans if circumstances regarding their operational posture change within 10
calendar days."  (Ex. 5, July 6 broadcast message at 3)  Thus, the broadcast message recognizes
that operational plans may change (just as they did for many schools in March), and does not set
forth any "severe consequences" for updating any submission made on July 15.  Nor does
Plaintiff identify what, if any, "severe consequences" might result from any alleged
noncompliance with the July 15 submission date.

Plaintiff also expresses frustration with a self-perceived requirement to provide increased
in-person classes in order to comply with the July message.  That is not so.  Plaintiff may

27

continue with its curriculum as it sees fit, admitting into the fall semester the same number of students as anticipated. The July message only requires fully online nonimmigrant students continue their online studies from abroad and schools to timely report programmatic changes to SEVP.  The July message does not restrain Plaintiff's educational curricula or programs. Nonimmigrant students may still participate in this learning experience and maintain an active SEVIS status. This is why Plaintiff does not explain how physical presence in the United States is necessary for a student to participate in a 100% online learning experience. Nor does it explain how the lack of physical presence by their nonimmigrant students participating in the online programs would negatively impact other students, who are also participating remotely in online courses, or the administration of their set curriculum.

This argument also cuts against any claim that the number of nonimmigrant students in their student body will decline as a result of the July message as students may still choose to participate through online learning outside this country.  Plaintiff has not demonstrated that if they implemented a 100% online curriculum, *fewer* students would choose to attend Johns Hopkins.  Plaintiff argues instead that if nonimmigrant students are not permitted to be present in the United States, nonimmigrant students may not choose to attend Johns Hopkins.  But Plaintiff cannot argue that there is a correlation between physical presence in the United States and the quality of education it provides if they are requiring the majority of current students, U.S. citizens, Lawful Permanent Residents (LPR) and nonimmigrants alike, to participate in online learning classes. Arguably, if Johns Hopkins decided to move to 100 percent online programs, it may be less appealing to U.S. citizen or LPR students as well, but Plaintiff does not argue its operations have been adversely impacted by any such lower enrollment.

Plaintiff's argument ultimately is speculative and insufficient to demonstrate an irreparable injury to Plaintiff's educational operations.   To the extent Plaintiff's alleged irreparable injury is based on alleged reliance on the March 2020 guidance, Defendants already have established above that Plaintiff had no such reliance interest in light of the disclosures made in that guidance that it remained subject to change and given the longstanding requirement for in-person classes.

Finally, the balance of equities weighs against issuing a temporary restraining order preventing SEVP from exercising its discretion in enforcing the statutory and regulatory requirements of nonimmigrant student programs.   Plaintiff downplays the harm that a temporary restraining order would inflict on the Government's authority to regulate the immigration status of foreign nationals seeking to enter or remain in the United States as nonimmigrant students. The Government has a strong interest in the uniform and proper application of its regulations governing the granting of visas to foreign nationals. *See Fla. EB5 Investments, LLC v. Wolf*, --- F. Supp. 3d. ---, 2020 WL 1079181, at *4 (D.D.C. Mar. 6, 2020) (citing *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1220–21 (D.C. Cir. 1981)). Congress, through the INA, has delegated to the Secretary of Homeland Security significant authority to administer and enforce the immigration and nationality laws, including those governing the admission of foreign students. *See* 8 U.S.C. §§ 1103(a), 1184(a)(1); *cf. Arizona v. United States*, 567 U.S. 387, 408–09 (2012). Any order that enjoins a governmental entity from enforcing actions taken pursuant to statutes enacted by the duly elected representatives of the people constitutes an irreparable injury that weighs heavily against the entry of injunctive relief.   *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977). It is also well-settled that the public interest in enforcement of United States immigration laws is significant. *United States v. Martinez-Fuerte*,

428 U.S. 543, 556-58 (1976); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Blackie's House of Beef*, 659 F.2d at 1221 ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant.").

The public has an interest in ICE, as well as CBP and the U.S. Department of State, being allowed to enforce immigration laws without undue interference in the manner, and in accordance with the statutes, proscribed by Congress- which includes requiring schools to meticulously monitor and report the educational conditions of their nonimmigrant students so ICE may ensure compliance with immigration laws. The alleged administrative inconveniences do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermines the "efficient administration of the immigration laws," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019).

## III.   PLAINTIFF LACKS ARTICLE III STANDING ON BEHALF OF STUDENTS

The majority of Plaintiff's alleged harms draws from the alleged impact to nonimmigrant students. But Plaintiff lacks third-party standing to bring claims on behalf of these unidentified students. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The "irreducible constitutional minimum of standing" contains three requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id*. Second, the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the

result [of] the independent action of some third party not before the Court." *Id*. Third, it must be "likely," as opposed to merely "speculative" that the injury will be "redressed by a favorable decision." *Id*. at 560-61 (internal citations omitted).

Plaintiff alleges the July policy announcement negatively impacts the students who attend Johns Hopkins, but Plaintiff may not raise alleged harms on behalf of students.  As a general rule, a party, organizational or otherwise, generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), including "enforcement of the immigration laws," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).

Third-party standing is an exception that requires a party to establish both a "close relationship" with the person who possesses the right and "whether there is a 'hindrance' to the possessor's ability to protect his own interests."  *See Kowalski v. Tesmer*, 543 U.S. 125, 129-30, (2004)  Even if Plaintiff could establish the "close relationship" requirement by virtue of a student's association with the university, Plaintiff has failed to establish any hindrance to any student's individual ability to seek to protect his or her own rights.  Plaintiff merely alleges a variety of potential burdens some nonimmigrant students may or may not experience if required to continue their 100 percent online education outside the United States.  As Plaintiff cannot establish third-party standing on behalf of nonimmigrant students, these alleged harms cannot be the basis to issue a temporary restraining order in this case.  Plaintiff is an educational organization and the *only* harms to itself that are alleged are speculative.  Plaintiff's allegations regarding the speculative impact on nonimmigrant students is not properly before the Court as Plaintiff lacks standing to bring such claims.

## IV. CONCLUSION

For reasons stated above, the court should deny Plaintiff's request to enter a temporary restraining order and preliminary injunction preventing the implementation of the July policy announcement.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. BAR # 924092
Civil Chief

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Counsel for Defendants